In re **SOUTHERN INDUSTRIAL BANK-ING CORPORATION, Debtor.**

**Thomas E. DUVOISIN, Liquidating Trustee, Plaintiff,**

v.

**William and Hazel ANDERSON, et al., Defendants.**

**Adv. No. 3–83–00372.**

United States Bankruptcy Court, E.D. Tennessee.

Oct. 14, 1988.

J. Thomas Jones, Doris C. Allen, John A. Lucas, Jeffrey S. Norwood, and Mary M. Testerman, Knoxville, Tenn., for plaintiff.

Wagner, Myers, & Sanger, P.C., Knoxville, Tenn., Michael H. Fitzpatrick, J. Michael Winchester, Warren R. Webster, David Buuck, Knoxville, Tenn., John Dugger, Richard C. Jessee, Morristown, Tenn., J. Christopher Kirk, Knoxville, Tenn., Carleton E. Bryant, IV, John F. Weaver, James S. Tipton, Art Roberts, Jr., P.C., B.J. Reed, Knoxville, Tenn., Ferdinand Powell, Jr., Johnson City, Tenn., John P. Newton, Jr., John K. Harber, Ron Cunningham, Dexter Christenberry, Deke W. Brackett, Knoxville, Tenn., James C. Blackburn, Memphis, Tenn., James E. McCollum, Jerome Templeton, John H. Fowler, Ken E. Morrow, Craig J. Donaldson, William R. Banks, John Foley, Knoxville, Tenn., Joseph Q. Hunter, James D. Estep, III, Tazewell, Tenn., Joe Tipton, Knoxville, Tenn., Edward H. Moody, Morristown, Tenn., David A. Whitney, Scott R. Fransen, Knoxville, Tenn., Phillips & Hale, Rogersville, Tenn., C. Dwaine Evans, Morristown, Tenn., R. Louis Crossley, Byron D. Bryant, Knoxville, Tenn., Derry O. Jackson, Knoxville, Tenn., L. Kirk Wyss, Morristown, Tenn., Thomas McKinney, Jr., Kingsport, Tenn., Francis W. Headman, Knoxville, Tenn., Stanifer & Stanifer, Tazewell, Tenn., Mary B. Leibowitz, Knoxville, Tenn., Carl P. McDonald, Maryville, Tenn., Alan M. Parker, Knoxville, Tenn., Noe & Travis, Morristown, Tenn., Michael Nolan, Gullett, Sanford, Robinson, Nashville, Tenn., Joseph B. Yancey, Haynes, Meek, Summers & Mabry, John B. Waters, III, J.G. Christenberry, Knoxville, Tenn., Norman F. Walawender, Buffalo, N.Y., Floyd R. Hodge, John M. Norris, James L. Kennedy, Knoxville, Tenn., Jim Stambaugh, Morristown, Tenn., Herbert S. Moncier, Knoxville, Tenn., A. Wayne Henry, Loudon, Tenn., Gary E. Brewer, Morristown, Tenn., Poore, Cox, Baker, Ray & Byrne, Robert H. Watson, Jr., Lewis S. Howard, William Skaggs, Jr., Walter B. Johnson, Jack B. Draper, Knoxville, Tenn., Greg W. Eichelman, Morristown, Tenn., Joe E. Magill, Clinton, Tenn., W.W. Davis, Robert Haws, Earl S. Ailor, Howard G. Hogan, Knoxville, Tenn., Byron Trauger, Nashville, Tenn., Gerald C. Russell, Maryville, Tenn., Dean B. Farmer, Charles H. Child, Richard E. Faires, Knoxville, Tenn., Charles Gordon, Powell, Tenn., David J. Poss, Knoxville, Tenn., G. Rhea Bucy, Nashville, Tenn., Ray, Farmer & Baumgartner, Joseph J. Levitt, Jr., Pryor, Flynn & Priest, Wade Boswell, Knoxville, Tenn., Robert N. Navratil, Maryville, Tenn., David E. Smith, Knoxville, Tenn., Joe Costner, Thomas DePersio, Oak Ridge, Tenn., Eugene McCullough, Lockett, Slovis & Weaver, Knoxville, Tenn., Richard A. Spivey, Kingsport, Tenn., Walker & Walker, P.C., Mack A. Gentry, Robert J. Bird, Knoxville, Tenn., Billy P. Sams, Oak Ridge, Tenn., Clifford C. Cruze, Knoxville, Tenn., James R. Kelley, Nashville, Tenn., Daniel J. Goodman, James H. Hickman, III, Lawrence M. House, Marty McDonald, Knoxville, Tenn., Jack Rose, Fort Smith, Ark., David E. Rodgers, Anthony Farmer, Wilson S. Ritchie, Knoxville, Tenn., Douglas Q. Wickham, Raleigh, N.C., Stephen K. Garrett, Knoxville, Tenn., Edward E. Saleeby, Hartsville, S.C., Wade F. Smith, Jefferson City, Tenn., Richard M. Mayer, R. David Benner, Daniel L. Merriman, Wayne A. Whitehead, Jerome Templeton, Johanna McGlothlin, Knoxville, Tenn., for defendants.

Robert and Blanche Black, John C. Daniels, Larry R. Layman, Emerson and Sandra Owenby, Lois Elliott, David and Patti Payne, Ann M. Segars, C.W. and Helen Payne, Talmadge and Rowena Miller, Mr. & Mrs. Edward Charles, Harvey L. Sproul, Kathie Smith, Mary R. and David S. Gorghis, Dennis Stratikis, Charles W. Ridlen, Polly L. Rankin, Ernest E., Geraldine Douglas and Gregory L. Douglas, Pamela T. Hooper, Carol Ingrund, Mrs. John Bacon, Mr. & Mrs. George Archer, Cheri R. Avirom, James E. and Betty Jo Carter, William & Minnie Fendley, Jean Winstead, L. Lee Kull, Robert Clemens, Jr.,

Robert Clemens, Sr., E. and V. McKenzie, Chad Eric Sage, Minor, C.E. and Linda Sage, H.E. Dennison, Bonnie Bryant, Connie Williams, Donna R. Davis, H. Douglas Nichol, Robert and Nonnie Bennett, Gary Smiddy, Margaret Smiddy, Alice and Vernon Mays, Emma Davidson, Lois Elliot, Elizabeth Bristol, Patty Jane Lay, Hugh and Hazel Anderson, Keith and Brian Anderson, East Tennessee Bancorp, Inc., Wayne and Susan Bishop, Fred A. and Lois Williams, Gerald L. Evans, Nadine Evans, Dr. Travis E. Morgan, Harry Lillard, Rebecca Luck, pro se.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

The question presented is whether investors can shield withdrawals from Southern Industrial Banking Corporation ("SIBC") made 90 days before bankruptcy with the ordinary course of business exception in § 547(c)(2).

The following constitute findings of fact and conclusions of law. Bankr.R. 7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

## FACTS

SIBC, one of several interdependent financial institutions controlled by "Jake" and C.H. Butcher, was an industrial loan and thrift company which accepted the investments of their customers and in return issued debt instruments in various forms such as investment certificates, passbook accounts, thrift certificates, etc. *See DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),* 59 B.R. 978 (E.D. Tenn.1986).[1] SIBC induced hundreds if not thousands of individuals, many of whom were retired and on fixed incomes, to invest their savings in these debt instruments.

The Butchers treated SIBC as their private fiefdom. The testimony of James E. Steiner, the president of SIBC, demonstrated the extent to which the Butchers controlled the operation.[2] Although Steiner was the chief operating officer of SIBC, he could not approve "other loans" which he described as those in excess of $50,000. The Butchers and their accountant, David Crabtree, made these decisions and Steiner then issued the checks and filled out the forms, a most unusual task for the president and chief operating officer of a large financial institution. The Butchers ladled out $31,000,000 in "other loans" to themselves, their companies, their family, their friends, their business associates, politicians and, of course, a loyal employee such as Steiner.

The financial empire of the Butchers was well into its collapse in February of 1983. In approximately the first week of February, the State Commissioner of Insurance contacted Steiner and ordered him to stop issuing new investment certificates and to discontinue their advertisements inducing additional investors to do business with SIBC. Further evidence of the collapse was the Federal Deposit Insurance Corporation ("FDIC") coordinated examinations in 1982 of all Butcher related financial institutions. The FDIC ultimately focused on United American Bank ("UAB") in the week prior to February 14, 1983 for the purpose of selling or closing UAB.

While officers and employees of SIBC were aware of the financial problems of UAB by early Monday, February 14, most of the general public probably learned for the first time of the seriousness of UAB's problems when it failed to open that day. Knowledge of this failure panicked SIBC

---

1. SIBC was chartered in 1929 as a "Morris Plan Bank" and performed services similar to those of investment, savings, and loan companies. In 1957 SIBC amended its charter under the "Industrial Loan and Thrift Act" of 1951 and TENN.CODE ANN. §§ 45–5–301, 304, and operated under these provisions until 1983. *DuVoisin v. Anderson,* 59 B.R. at 980.

2. This was the first time in the unraveling of the affairs of SIBC that Steiner testified without taking the Fifth Amendment. Steiner is 45 years old. Prior to joining SIBC where he served as its president and chief operating officer, he was an executive vice-president at a small industrial loan and thrift company. At this time, he is employed as an investigator for a local Knoxville attorney.

investors who spent most of the week beginning Monday, February 14, 1983 withdrawing or attempting to withdraw their investments from SIBC. In the nine week period from December 10, 1982 until February 11, 1983, approximately $7,521,000 in investments was withdrawn. In the five days from February 14 until February 18 investors withdrew more than twice that amount, approximately $15,619,000.

SIBC attempted to prepare for this onslaught. Steiner was contacted on Sunday, February 13 at 4:00 a.m. for a meeting at 6:00 a.m., and he stayed at his office most of that Sunday. On Monday, February 14 at 6:00 a.m., Steiner had another meeting with SIBC investment counselors and branch managers to inform them how to deal with the anticipated run.

At one branch it was decided that only two investment counselors would deal with investors and the other two would be hidden in a back room. The two dealing with the investors were told to slow down the process of withdrawals as much as possible.

That Monday, numerous people were in the parking lots of the branches. James Travis, the manager at the West Town Branch and supervisor of three other branches, described the scene as one of commotion. At one point Steiner ran out of his office at that branch after hearing a loud noise thinking Travis had been shot by an irate investor. On Tuesday and Wednesday, February 15 and 16, SIBC's bank accounts ran out of cash and investors were receiving bad checks. Travis described Wednesday as chaotic. That day when he opened the door to customers, the parking lot was full and hecklers were yelling at him. On Thursday morning, Travis didn't know what bank on which to write checks and the investment counselors would not go out to deal with the investors until they had proof of money in a bank on which SIBC could write checks.

Roy Nichols, an assistant vice-president and supervisor of another four branches, described a similar picture. He attended the Monday morning meeting and then said business was different from then on. He testified their day-to-day concern was just keeping SIBC alive and things were definitely out of the ordinary. According to him, every branch was experiencing runs and every branch had a bad check problem.

Some SIBC investors were able to withdraw their investments during this run period. Others were not so fortunate and lost their life savings. They continue to wait for a dividend from the reorganization of SIBC.

One example of the investor who received nothing was Hoyle McNeil, a retired businessman and former city councilman and vice-mayor of Knoxville. McNeil had a $20,000 certificate of indebtedness for a term of six months which he had invested in October of 1982. During the week of the run, probably Wednesday, he went to his branch. He was told the accounts were frozen and that he could not get his investment back even with the usual and ordinary penalty. McNeil has lost his total investment in SIBC unless the trustee succeeds at avoiding preferences and other transfers in order to equitably distribute the assets and losses in the SIBC reorganization.

Another such honest but unfortunate investor was Thomas R. Howell who had worked at the Knoxville Utilities Board for 33 years. He chose to invest his hard earned savings in three certificates of investment in November of 1982 and January of 1983. The certificates totalled over $48,000. Howell went to his branch on Tuesday, February 15 after hearing that UAB had failed. He was told he couldn't redeem his certificates because they had not matured. This was extraordinary since SIBC had always allowed early redemption. He, like all other investors, had been told he could get his investment back at any time with an interest penalty. As with McNeil, Howell also has lost his savings except to the extent that he receives a distribution from the reorganization.

Ultimately, SIBC filed Chapter 11 on March 10, 1983. A liquidating plan of reorganization was confirmed on November 28, 1983 under which a "liquidating trustee" was designated to receive certain claims

and causes of action of the debtor, including all potential preference actions. Judge Clive Bare consolidated more than 900 of these preference proceedings to decide common issues.[3] All elements of a preference under 11 U.S.C. § 547(b) have been established. *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),* 88 B.R. 174 (Bankr.E.D.Tenn.1987). These defendants now raise § 547(c)(2) defenses.

## CONCLUSIONS OF LAW

Bankruptcy laws have always sought to distribute assets equally among all creditors. *E.g., Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298 (1941); *Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382, 385 (1930); *Lynch v. Johns–Manville Sales Corp.,* 710 F.2d 1194, 1197 (6th Cir.1983). Section 547 preference actions preserve equal distribution by preventing any creditor from receiving an excessive portion of the debtor's assets at the expense of other creditors. *See Pirie v. Chicago Title & Trust Co.,* 182 U.S. 438, 449, 21 S.Ct. 906, 910, 45 L.Ed. 1171, 1178 (1901); *Mandross v. Peoples Banking Co.,* 825 F.2d 1067, 1069 (6th Cir. 1987).

Congress designed § 547 to force any creditor who received "a greater payment than others of his class ... to disgorge so that all may share equally." H.R.REP. NO. 595, 95th Cong., 1st Sess. 178 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6138. Congress also designed § 547 to prevent a "race of diligence" between creditors, "By permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing ... to dismember the debtor during his slide into bankruptcy." H.R.REP. NO. 595 *supra* at 177, U.S.Code Cong. & Admin.News 1978, at 6138; *see Mandross v. Peoples Banking Corp.,* 825 F.2d at 1069. Here we clearly had a race of diligence that dismembered

the debtor and that will, absent these preference actions, result in a grossly unequal distribution of assets among investors.

There were two groups of investors after the collapse of SIBC. Those who through diligence, inside information or luck protected their interests and currently have a complete recovery and those who were not as quick and, "did not withdraw their money and found their cash 'trapped' in the debtor-in-possession and now subject to the terms of the confirmed plan of reorganization." *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),* 87 B.R. 518, 522 (Bankr.E.D.Tenn.1988). Congress has determined that these two groups should be treated equally.

Congress considered equality of distribution so important that it specifically eliminated consideration of creditors' good faith or knowledge from preference actions,

> [A] creditor's state of mind has nothing whatsoever to do with the policy of equality of distribution, and whether or not he knows of the debtor's insolvency does little to comfort creditors similarly situated who will receive that much less from the debtor's estate as a result of the prebankruptcy transfer to the preferred creditor.

H.R.REP. NO. 595 *supra* at 178, U.S.Code Cong. & Admin.News 1978, at 6139.

Congress, however, exempted certain "normal" financial relations between creditors and debtors from preference actions. Section 547(c)(2) exempts transfers made in the ordinary course of business of both parties to the transaction. Permitting such routine transactions does not interfere with Congress' policy of discouraging unusual acts immediately before bankruptcy. Further, creditors, forced to regurgitate payments made in the ordinary course of business according to ordinary business terms, would cut off financially troubled debtors at a time when creditor cooperation is most needed. H.R.REP. NO. 595, 95th Cong.,

---

**3.** *See, e.g., DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),* 71 B.R. 351 (Bankr.E.D. Tenn.1987) (SIBC was insolvent at all times during preference period); *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),*

66 B.R. 370 (Bankr.E.D.Tenn.1986) (preference actions tried without jury); *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.),* 66 B.R. 349 (Bankr.E.D.Tenn.1986) (summary judgment on twelve various issues).

1st Sess. 373, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 5963, 6329; *see* S.REP. NO. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 5874.

Section 547(c)(2) states:

(c) The trustee may not avoid under this section a transfer ...

(2) To the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and,

(D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (West 1983).[4] This court previously determined that SIBC was a legitimate business operation despite its insolvency and the malfeasance of its principals. Defendants may raise § 547(c)(2) as a defense. *DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 87 B.R. 524 (Bankr.E.D.Tenn.1988).

Defendants must prove that their transactions meet each of the requirements of the four subsections of § 547(c)(2) by a preponderance of the evidence. *In re Production Steel, Inc.*, 54 B.R. 417, 419 (Bankr.M.D.Tenn.1985).

## A.   § 547(c)(2)(A): Debt Incurred in Debtor's and Transferee's Ordinary Course of Business

Section 547(c)(2)(A) requires that the *debt* be the kind routinely carried between the creditor and the debtor. All the defendants meet their burden on this requirement. Every defendant purchased investments normally offered by SIBC—investment certificate, passbook account or variable interest passbook ("VIP") account—following the established procedures. All of the defendants had legitimate reasons for

investing their money in interest bearing accounts. Debts that do not meet § 547(c)(2)(A) include situations such as *DuVoisin v. FSLIC (In re Southern Indus. Banking Corp.)*, 72 B.R. 512, 515 (Bankr.E.D.Tenn.1987) where the law forbade the creditor to deposit funds into an uninsured institution.

## B.   § 547(c)(2)(B): 45-Day Rule

Each defendant under subsection (B) must establish that SIBC paid that defendant within 45 days of the date that SIBC incurred the debt to that defendant. The key measuring dates are the dates SIBC incurred each debt for both principal and interest and the date that SIBC completed its payment to each defendant.

### 1.   Timing of Transfers of Principal

A debt is incurred for § 547(c)(2) purposes on the date the debtor first becomes obligated. *Grogan v. Liberty National Life Insurance Co. (In the matter of Advance Glove Mfg. Co.)*, 761 F.2d 249, 250 (6th Cir.1985); *accord In re White River Corp.*, 799 F.2d 631, 632 (10th Cir.1986); *In re Gold Coast Seed Co.*, 751 F.2d 1118, 1119 (9th Cir.1985); *In re Iowa Premium Service Co.*, 695 F.2d 1109, 1111 (8th Cir. 1982); *Barash v. Public Finance Corp.*, 658 F.2d 504, 509 (7th Cir.1981). *See also In re Ken Gardner Ford Sales, Inc.*, 23 B.R. 743 (E.D.Tenn.1982); *In re Property Leasing and Management, Inc.*, 46 B.R. 903, 913 (Bankr.E.D.Tenn.1985).

SIBC became obligated to the defendants for the principal of the debts on the date it received their money and issued debt instruments in return. *See Weill v. Southern Credit Union (In re Bowen)*, 3 Bankr. 617, 619 (Bankr.E.D.Tenn.1980) (debt on note incurred when debtors received consideration). *See also Barash v. Public Finance Corp.*, 658 F.2d 504 (7th Cir.1981). Investment certificates, similar to certificates of deposit, paid a fixed interest rate and matured at thirty days to eight years.

---

**4.** Section 547(c)(2)(C) was deleted in 1984, but remains applicable in the SIBC bankruptcy because the case was filed before the deletion

became effective. *DuVoisin v. Howard (In re Southern Indus. Banking Corp.)*, 93 B.R. 605 (Bankr.E.D.Tenn.1987).

At maturity, many customers reinvested in new certificates. In the context of serial renewals, execution of a new documents does not extinguish the first obligation unless all parties agree. *Commerce Union Bank v. Burger–in–a–Pouch,* 657 S.W.2d 88, 90 (Tenn.1983). This is a question of fact, and the party arguing discharge has the burden of proof. *Id.* In *Burger–in–a–Pouch,* cited by all parties, the most compelling fact was reference to the original contract found in the renewal note, "indicating that in the minds of the appellant and the maker the original note and contract were not to be affected by the renewal." *Id.* at 91.

All investors believed that the physical cancellation which occurred at renewal extinguished liability. A reinvestment was recorded on SIBC's books as both a disbursement and a receipt of new funds, and tax records were maintained for each certificate, not each customer. The behavior of both parties is consistent with defendants' position that renewal of an investment certificate constituted incurrence of new debt,[5] so that the debt for an investment certificate was incurred on the date it was last issued.

SIBC incurred new debt for the principal in its passbook accounts whenever it accepted deposits into those accounts for purposes of § 547(c)(2).

When defendants withdrew their investments, SIBC paid them by check. Two of the payments to defendants were clearly outside the 45–day rule: (1) the $6,000 check issued January 10, 1983 to defendants, the Hills and Reynolds (the "Hills") was repayment of principal of a six-month certificate issued July 8, 1982, and (2) $15,000 of the $24,469.66 check issued to defendant Meredith on February 17, 1983, was repayment of principal of a one year investment certificate issued September 14, 1982.

In every other case, the defendants received a check within 45 days of the date that SIBC incurred the debt for principal. Whether receipt of such checks constitutes a transfer in the context of a preference action is a federal question. *McKinsey v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945). The majority view is that under § 547(c)(2) payment by check occurs on the date of delivery if the check is presented for payment within the 30 day period deemed reasonable by U.C.C. § 3–503(2), TENN.CODE ANN. § 47–3–503(2), and honored upon presentment. Otherwise, the date of transfer is the date the check is honored.[6] *Durham v. Smith Metal & Iron Co. (In re Continental Commodities),* 841 F.2d 527, 530 (4th Cir.1988); *Kupetz v. Elaine Monroe Assocs. (In re Wolf & Vine),* 825 F.2d 197, 200–01 (9th Cir.1987); *Bernstein v. R.J.L. Leasing (In re White River Corp.),* 799 F.2d 631, 633–34 (10th Cir.1986); *O'Neill v. Nestle Libby's P.R., Inc.,* 729 F.2d 35, 37–38 (1st Cir.1984). *Accord Anderson v. Ocean Garden Products (In re Metro Produce, Inc.),* 80 B.R. 570, 573 (Bankr.N.D. Ga.1987); *Begier v. Krain Outdoor Advertising, Inc. (In re American Int'l Airways, Inc.),* 68 B.R. 326, 333 (Bankr.E.D. Pa.1986); *Young Supply Co. v. McLough Steel Corp.,* 55 B.R. 356 (E.D.Mich.1985).

This is also the rule in the Eastern District of Tennessee. *E.g., Newton v. Andrews Distributing Co. (In re White),* 64 B.R. 843 (Bankr.E.D.Tenn.1986); *Lancaster v. Morristown Block and Concrete Products (In re Compton),* 55 B.R. 180 (Bankr.E.D.Tenn.1985).

All defendants presented their checks within the 30–day period. The only checks dishonored were those issued to defendants Bryan, Pilson and the Reeses. Even these defendants received checks which were ultimately honored within 45 days of the date that SIBC incurred its debt for principal to them. Thus, all defendants meet the 45–

---

**5.** Plaintiff suggests new debt would be incurred only if SIBC cancelled a certificate, issued a check to a defendant, received a check back from the defendant, and then issued another investment certificate. No financial institution should tolerate such inefficiency, nor is intent

of the parties revealed by the volume of documents their transaction generates.

**6.** The Sixth Circuit has *not* decided this issue. 761 F.2d at 249, n. 1.

day rule for the debts of principal except for the $6,000 payment to the Hills and the $15,000 payment to Meredith.

### 2. Timing of Interest Transfers

Controlling precedent in this district holds that the debt for interest is incurred when the interest accrues. *In re Ken Gardner Ford Sales, Inc.*, 10 B.R. 632 (Bankr.E.D.Tenn.1981), *aff'd*, 23 B.R. 743 (E.D.Tenn.1982); *accord Iowa Premium Service Co. v. First National Bank*, 695 F.2d 1109 (8th Cir.1982). *Cf. In re Advance Glove*, 761 F.2d at 250 (installment debts which are incurred as a service is consumed provides additional authority for this position). The holding in *Gardner Ford* is far from a settled point of law. *See In re Property Leasing and Management, Inc.*, 46 B.R. 903, 913 (Bankr.E.D. Tenn.1985) (the debt for interest was incurred concurrently with the debt for principal because "[o]nce [the debtor] received the money it assumed a binding obligation, albeit contingent and unmatured, to pay for the use of that money.") But *Gardner Ford* was affirmed by the district court and is controlling.

In this case, interest accrued daily on SIBC investments. SIBC paid interest out monthly to the defendants that held certificates. These payments are with the 45–day rule. All the passbook accounts at issue were closed within 45 days of the date they were opened. Any interest accrued on these accounts was within the 45–day rule.

### C. § 547(c)(2)(C): Payment Within Ordinary Course of Business Between the Parties

Payment in the "ordinary course of business," contemplates transactions that the parties subjectively view as ordinary. *In re SIBC*, 72 B.R. at 515; *In re Production Steel, Inc.*, 54 B.R. at 423. Courts have held untimely payments, payments in unusual form, amount, or for an unusual transaction outside the ordinary course of business. *In re Ullman*, 80 B.R. 101 (Bankr.S.D.Ohio 1987); *In re White*, 58 B.R. at 269.

The pertinent inquiry is whether SIBC and the defendants each acted in the ordinary course of business in each transaction: was SIBC following routine procedures or was it consciously attempting to aid or frustrate the investor's attempted withdrawal; and was each investor withdrawing funds in a routine manner or was each taking extraordinary steps to protect his investment even at the cost of dismembering SIBC. Under this analysis, payments to Defendants Dyer and Duggan were made in the ordinary course of business, and certain payments to Defendants Meredith, Pilson, Galyon and the Hills were made in the ordinary course of business.

### 1. Payments to Defendants Within the Ordinary Course of Business

The clearest cases of payments in the ordinary course of business are: (1) redemptions before the run period of matured investments; and (2) regular interest payments before the run period. The Hills collected two matured investment certificates on January 10, 1983, well over a month before publicity of the possible failure of UAB and the ensuing run on SIBC. One was a six-month certificate for $6,000. This payment, as mentioned before, failed to meet the 45–day rule. The second certificate was a 38–day investment in the amount of $1,500. Meredith received $6,055.87 on January 17, 1983 upon redemption of a one month certificate. These payments were within the ordinary course of business.

The trustee argues that the Hills redeemed their investment certificate outside the ordinary course of business because they had a history of renewing investments. Since 1979 the Hills traditionally renewed their investments at maturity. This argument implies that the Hills could never redeem their investment in the ordinary course of business. Such simply cannot be the case. Here they withdrew money to pay off their car loan. The Hills withdrawal of the $1,500 principal was in the ordinary course of business.

Defendants Meredith, Pilson and Hills also received routine monthly interest payments on their investments before the run

period. Meredith received payments of $175.68, $127.84, $181.54 and $270.41 in December, 1982 and January, 1983. Defendant Pilson received $191.24 on January 1, 1983 and $95.76 on February 1, 1983. The Hills received interest payments of $267.54 and $16.01 in January, 1983, and $131.09 on February 8, 1983. All these interest payments were made on the monthly due dates with checks that were negotiated and honored routinely. These payments are in the ordinary course of business.

A somewhat closer set of cases concern those defendants who made pre-run withdrawals that did not meet the technical written requirements for withdrawal. All of SIBC's accounts formally limited methods of withdrawal. Certificates of investment had specific maturity dates. Passbook accounts required depositors to give 60 days' notice to withdraw funds.

Transactions that do not meet such formal requirements may still be within the ordinary course of business if the transactions were consistent with other transactions between the parties. *In re Production Steel, Inc.*, 54 B.R. at 423.

SIBC had long permitted any investor to withdraw investments at any time. Certificate holders generally paid an interest penalty, but could redeem certificates any time before maturity. Passbook holders could withdraw funds without notice or penalty.

Transactions consistent with such long-standing business practices were within the ordinary course of business of SIBC and its investors. Payments to investors must contain some irregularity beyond early withdrawal or withdrawal without notice to be out of the ordinary course of business. Here such withdrawals by defendants Dyer and Duggan, and one payment to Defendants Galyon were within the ordinary course of business.

Defendants Dyer redeemed their investment certificate prematurely on January 5, 1983, almost six weeks before the run on SIBC, and well in advance of any generally

known concerns of a Butcher collapse. Allen Dyer testified he withdrew his investment to cover various expenses related to starting his own business.

Defendants Duggan placed $40,000 in a VIP passbook account on January 25, 1983. Six days later on January 31, he moved it to a "Portfolio" account at First Tennessee Bank where he could write checks unlike the SIBC VIP account. Easy access to the money was viewed by Charles Duggan as bargaining power for purchasing the real property on which his used car dealership operated. At the time of withdrawal, there was no contract on the real estate and it was not purchased until November of 1983. Although this payment occurred only two weeks before the run, there were no widespread rumors regarding UAB or SIBC nor was SIBC operating any differently than it always did. Mr. Duggan's receipt of $40,-000 on January 31, 1983 was in the ordinary course of business.

On January 14, 1983, Defendants Galyon invested $5,000 in a one-year certificate and $20,110.20 in a separate one-year certificate. On January 17, 1988, Marie Galyon redeemed the $20,110.20 certificate. She received a check for $3,000 and reinvested the remaining $17,110.20 into another one-year certificate. The $3,000 payment was made in the ordinary course of business.

### 2. Payments to Defendants Outside the Ordinary Course of Business

#### a. *Insufficient Funds Checks*

■ The ordinary course of business exception treats checks as cash because it is a special category of contemporaneous exchange. *See Ray v. Security Mutual Finance Corp. (In re Arnett)*, 731 F.2d 358, 361 (6th Cir.1984); *In re Johnson*, 25 Bankr. at 897 (post-dated check not cash payment). Receipt of checks later returned for "not sufficient funds" ("NSF") catapults payment outside the ordinary course of business sanctuary by effecting an extension of credit not intended by the parties.[7] *Ewald Brothers v. Kraft, Inc. (In re*

---

7. SIBC was not a bank. *DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 59 B.R. 978 (Bankr.E.D.Tenn.1986). It wrote checks against its accounts on deposit at Butcher related banks like an individual writes checks against a personal checking account.

*Ewald Brothers, Inc.),* 45 B.R. 52, 58 (Bankr.D.Minn.1984); *see Still v. Kinsberry Homes (In re Downs),* 65 B.R. 1, 2–3 (Bankr.E.D.Tenn.1985) (§ 547(c)(2)(C) probably not satisfied when check dishonored); *Newton v. Andrews Distributing Co. (In re White),* 64 B.R. 843, 847 (Bankr.E.D. Tenn.1986) (check constitutes payment unless dishonored).

There being no history of investors depositing SIBC checks a second time before payment, all payments made with NSF checks are outside the ordinary course of business. *See Ewald,* 45 B.R. at 52 n. 14. Therefore, the § 547(c)(2) defense automatically fails as to the defendants, the Reeses and Bryan, and to Defendant Pilson except to the extent of interest payments previously mentioned.

### b. Unusual Collection Methods

■ Payment resulting from amplified pressure on the debtor also removes the transfer from the ordinary course of business. *See, e.g., In re Craig Oil,* 785 F.2d 1563 (11th Cir.1986) (demand for cashier's checks outside ordinary course); *In re Production Steel, Inc.,* 54 B.R. at 423 (outside ordinary course to demand substantial down payments previously not required and to shorten time for payment).

Defendant Self redeemed his certificate of investment on Monday, February 14. It was "all over" the news that the UAB had not opened and he knew it was connected with SIBC. With the UAB problem, he did not think his investment was safe at SIBC particularly since it was not federally insured. SIBC was reluctant to give him his investment and the process took over an hour. Furthermore, this was the first time he had to deal with a branch manager and even then the only way he got his investment was to "put his foot down" and say he wouldn't leave until he got his money. Obviously, SIBC's "slow walking" procedures caused Self to take these unusual steps out of the ordinary course of business, yet, the collection method places this withdrawal outside the § 547(c)(2)(C) defense.

### c. Payments During and After the Run Period

■ Withdrawals made during and after the run period, with rampant news reports of the UAB's failure and of SIBC's inability to honor checks, were not within the ordinary course of business of SIBC. SIBC was slow walking repayments and making them only when they had to, except apparently to their own employees such as Defendant Pilson. At times SIBC didn't know what bank it had money in. Creditor investors were trying to get their investments back before they were lost.

It is only necessary to find the transfer was outside the ordinary course of business of one party to the transaction to deny protection of the § 547(c)(2) exception. SIBC operated outside the ordinary course of business during and after the run period. All defendants who withdrew investments during that time cannot successfully raise the § 547(c)(2) defense. The interest payment of $118.41 to the Hills on March 8, 1983 also fails to meet the requirements of § 547(c)(2) because it occurred after the run period.

Moreover, some of the defendants who withdrew funds during this time frame even failed to show that their withdrawal was within the ordinary course of business of their dealings with SIBC.

Defendant Meredith, a retired high school teacher, redeemed two investment certificates totalling $24,469.66 at the height of the run period, on Wednesday, February 17, 1983, well before their maturity dates. Reports that checks from SIBC were not being honored permeated radio, television and print news. Meredith's alleged reasons for the early redemption were personal problems and concerns over the safety of his money. His testimony was contradictory, and he admitted to lying during his discovery deposition. His testimony in court was as incredible as any witness the court has heard in almost seven years on the bench. Clearly any reason for early withdrawal was fabricated to conceal that he tried to claim his investment from SIBC before its apparent failure. As discussed before $15,000 of this payment

also failed to meet the 45–day rule because it represents principal invested on September 14, 1982.

The § 547(c)(2) defense fails as to Meredith except for the December, 1982 and January, 1983 interest payments and the January, 1983 principal payment.

Defendants Galyon acquired two one-year investment certificates with a value of approximately $23,000 in January of 1983, and redeemed them 11 months early on Friday, February 11, 1983. On Friday rumors of the imminent failure of UAB generated about 20 unidentified customers at the West Town branch between 4:00 p.m. and 5:00 p.m. demanding their funds. That afternoon Victor Galyon received a check dated February 14, 1983 and mistakenly written for $5,000 more than they had invested. He claimed he didn't notice the discrepancy and the entire check was deposited into a checking account at a bank. Later Marie Galyon reported the overpayment to SIBC and returned the mistakenly paid funds.

The Galyons contend the reason for their early redemption was for partial financing of their "dream home" to be built on property of Marie Galyon's mother. Construction, however, never occurred because the mother refused to transfer title to the Galyons, a prerequisite to additional financing.

A former investment counselor at SIBC testified that she had called the Galyons on February 11 to advise them SIBC was in trouble and to redeem their certificates so they wouldn't lose their investment. She also called other of her customers for the same purpose. While the Galyons deny receiving that phone call, based on the manner and demeanor of the witnesses, the court believes the version given by the investment counselor. Her version is also supported by inconsistencies in Victor Galyons' story of immediately needing to have cash for a house to possibly be built in the future and his failure to provide pertinent facts about this story in his discovery deposition.

The Galyons obviously withdrew their investment certificates to recover their investment before it was lost as the investment counselor warned. Ignorance of a $5,000 discrepancy is most charitably explained by a frenzy to get the check deposited before the close of business on Friday. The check was dated the 14th instead of the 11th, indicating that it was written after 2:00 p.m., another fact consistent with rushing to deposit the check.

For these reasons the Galyons' receipt of funds on February 14, 1983 from SIBC was outside the ordinary course of their transactions with SIBC. The January, 1983 payment of $3,000 was in the ordinary course of business.

Defendant Condry closed his VIP passbook account on February 14, 1983, the first day of the run. On that day, he was aware that the UAB, a Butcher bank, had failed. After receiving his check, he went to the bank nearest to SIBC and tried to cash it. The woman he dealt with told him an officer would have to deal with the matter. The officer told him they would only take it if it were put in a certificate of deposit with the check being given one week to clear. Condry then went to the next closest financial institution, Security Federal Savings & Loan, and they wouldn't cash it. He then went home for the night worried, bothered and convinced that he would get stuck with the check. The next day he went to the Bank of Maryville where he had done business in the past. They agreed to cash his $17,500 SIBC proceeds check only if he put $15,500 in a certificate of deposit for six months and $1,800 in a checking account which gave him $200 in cash from the check. He described this process as being very unusual. Condry's closing of his SIBC account on the first day of the run, combined with his extraordinary efforts to cash his SIBC check, demonstrates that he was not acting in the ordinary course of business, but was extracting his investment from an insolvent SIBC.

Defendant Brenda Pilson has already been denied a defense under § 542(c)(2) because she received an NSF check and because she withdrew her investment during the run period. However, further facts

about Pilson's transaction show how an employee of SIBC was given different treatment from other investors which would further deny her an exception pursuant to § 547(c)(2).

Pilson had worked for SIBC since 1980 and was a senior investment counselor at the West Town branch. She had made investments in SIBC as early as 1981. On all her investments she always looked for the best rate possible; in the fall of 1982 and the beginning of 1983, that was in 30–day certificates of investment.

On September 1, 1982, Pilson invested $10,000 in a 30–day investment certificate. On October 1, 1982 she added $1,000 to her investment and received another 30–day investment certificate which she renewed in 30–day certificates of investment on October 31, 1982, November 30, 1982 and January 1, 1983. On February 1, 1983, she invested the proceeds of her last certificate of indebtedness in a VIP account since that had the best interest rate that SIBC was offering.

On Monday, February 14, she withdrew all of her investment from the VIP account and received a check for $11,914.21. She originally thought it was later that week because everything was so confused during the run. Although her reason on direct examination for withdrawing her investment was that she was thinking about investing in a condominium which was never purchased, she testified on cross-examination that the run was a factor in withdrawing her investment.

The first check written to her from SIBC was NSF. According to Pilson, no SIBC investor's checks had ever bounced before. She testified she was upset the check had bounced the same as everyone else who had received NSF checks. She told Travis, the branch manager, she wanted a good check and another check was issued. Travis then called C & C Bank on Wednesday, February 17 to find out if there was money in SIBC's account to cover it. He then told Pilson to hurry down to C & C because it might not be good for very long and to get a cashier's check. With this "inside" information, Pilson was able to withdraw her investment from SIBC.

Thus, Pilson's actions during the run period were in no way in the ordinary course of her business with SIBC and the payment of $11,914.21 fails to fall within the exception of § 547(c)(2) for a third separate reason. However, two interest payments previously mentioned are within the ordinary course of business.

### D.  § 547(c)(2)(D):  Ordinary Business Terms

■ The defendants who have met their burden thus far, Defendants Dyer, Duggan, and as to certain payments, Meredith, Pilson, Galyon and Hills, must last show that the payments were made according to objectively ordinary business terms. Some courts limit the inquiry to the past terms between the parties. *See In re Craig Oil Co.*, 785 F.2d 1563, 1566–67 (11th Cir.1986); *In re Sunup/Sundown, Inc.*, 66 B.R. 1021 (S.D.Fla.1986). Others expand the inquiry to determine whether the terms of the subject payments were objectively consistent with the ordinary terms used in the parties' industry. *In re Production Steel, Inc.*, 54 B.R. at 423; *Unimet Assets Disposition Trust v. Cramers, Inc.*, 85 B.R. 450, 453 (Bankr.N.D.Ohio 1988). For the reasons stated in *In re Production Steel, Inc.* this court adopts the latter approach.

Mr. Hill redeemed his $1,500 investment certificate at maturity in full compliance with the written terms of his investment. All interest payments to Meredith, Pilson and Hills were made in accordance with the terms of the instruments. These payments are made within objectively ordinary business terms.

The Dyers and Galyons redeemed their investment certificate before maturity, and the Duggans closed their VIP account without the required 60 days' notice. Steiner testified that competing financial institutions permitted premature withdrawal of certificates and withdrawals from other accounts without required notices. The court finds this sufficient to establish that the payments to the Dyers, the Duggans, and the January 17, 1983 payment to the

Galyons were within ordinary industry practices.

All defendants received checks that were negotiated and honored. Defendants Duggan and Dyer, and to the extent of the payments that meet the other requirements of § 547(c)(2), Meredith, Pilson, Galyon and Hills received payments according to ordinary business terms.

## SUMMARY

In summary, the following types of transfers were outside the ordinary course of business: (1) all payments which involved the use of NSF checks; (2) all payments in which defendants either used unusual collection methods or in any other way acted outside their ordinary course of dealings with SIBC; and (3) all payments made during and after the run period. Payments before the run period made within 45 days of SIBC's incurring of the debt for interest, matured investments and unmatured investments, absent some other unusual act by either SIBC or the individual investors, are within the § 547(c)(2) ordinary course of business defense.

For these reasons the following payments were made in the ordinary course of business and are not recoverable by the trustee under § 547(b): (1) all payments to the Dyers; (2) all payments to the Duggans; (3) the $127.84, $270.41, $175.68, $181.54 interest payments and the $6,055.87 principal payment to Meredith; (4) the $191.24 and $95.76 interest payments to Pilson; (5) the $3,000 principal payment to the Galyons; and (6) the $1,500 principal payment and the $267.54, $16.01 and $131.09 interest payments to the Hills.

The other payments to Meredith, Pilson, the Galyons and the Hills, and payments to the remaining defendants do not qualify for the § 547(c)(2) defense for the reasons discussed.

The trustee is instructed to prepare a separate order for each defendant consistent with the findings of fact and conclusions of law contained herein.