In re NATIONAL ENTERPRISES, INC., Debtor.

NATIONAL ENTERPRISES, INC. Liquidating Trust, Plaintiff,

v.

ASSOCIATES LEASING, INC., Defendant.

Bankruptcy No. 90–33935–RS. Adv. No. 93–3032–RS.

United States Bankruptcy Court, E.D. Virginia.

Aug. 17, 1994.

Andrew J. Dolson, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, for plaintiff.

E. Olen Culler, Gayles, Boyles & Culler, Richmond, VA, for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes before the Court on National Enterprises, Inc. Liquidating Trust's complaint to avoid alleged preferential transfers of certain assets to Associates Leasing, Inc. ("Associates"). This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157(b)(2)(F) and 1334. Venue is appropriate pursuant to 28 U.S.C. § 1409. Upon consideration of the arguments of counsel, evidence presented at the January 28, 1994 hearing, stipulations of fact, and briefs submitted after that hearing, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

National Enterprises, Inc. ("NEI" or "The Debtor") filed its petition for Chapter 11 relief on December 10, 1990. Under a Joint Amended Plan of Liquidation approved by this Court on April 2, 1992, the National Enterprise Inc. Liquidating Trust ("The Trust"): was formed which was, among other things, empowered to pursue actions such as the one before the Court. The basis for this suit lies in a pre-bankruptcy agreement entered into by NEI with Associates in order to lease trucks to enable the debtor to transport its goods.

The three suspect transactions between the parties were payments under this lease agreement. On September 24, 1990, the Associates received a check for $40,653.54. It did so again on October 22, 1990 in the amount of $40,653.54. The final suspect transfer took place on November 29, 1990 when NEI transferred $40,946.31. Upon deposit by Associates, all three checks (collectively "The Transfers") were honored by the debtor's bank.

Central to this case are the parties' billing and payment practices under the lease agreement. On the 14th or 15th day of the month, Associates would send out invoices for the following month. According to the Trust, in the thirty-six months before the commencement of the preference period, payments were made by NEI an average of 6.86 days after the first of the month due date and during the preference period, payments were made on an average of twenty-five days after the first of the month. According to Associates, in the nine months prior to the preference period, payments were made on an average of twelve days after the due date.

### Conclusions of Law

The Trust's action is based upon 11 U.S.C. § 547(b), which in pertinent part states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent

    (4) made—

        (A) on or within 90 days before the date of the filing of the petition;...

    (5) that enables such creditor to receive more than such creditor would receive if—

        (A) the case were a case under chapter 7 of this title;

        (B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

According to the stipulations agreed upon by the parties, all of these elements have been found present in all three transfers made after September 11, 1990 or in the ninety days before the filing of NEI's Chapter 11 bankruptcy.

■ While the parties agree that the transfers meet all the requirements under § 547(b), Associates contends that the transfers still are not preferential because they come under a statutory exception to § 547(b) enumerated in 11 U.S.C. § 547(c), which states in pertinent part:

> (c) The trustee may not avoid under this section a transfer—
>
> (2) to the extent such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms;

The parties have agreed that the Lease Agreement was incurred by the debtor in its ordinary course of business, thereby satisfying part (A) of § 547(c)(2). However, there is disagreement as to whether the transactions comply with parts (B) and (C). Pursuant to 11 U.S.C. § 547(g)[1], Associates has the burden of proving the nonavoidability of the transfers. Its proof must be by a preponderance of evidence. *Miller & Rhoads, Inc. Secured Creditors' Trust v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.)*, 153 B.R. 725, 727–28 (Bankr.E.D.Va.1992). In other words, Associates must prove that the late payments made during the preference period were still within the ordinary course of business between the debtor and Associates and also that the payments were made according to ordinary business terms.

#### 1. 11 U.S.C. § 547(c)(2)(B)

The Trust argues that the almost unprecedented late payments made during the preference period prove that these transfers were indeed outside the parties' ordinary course of business. In order to determine whether this is true, the Court must examine the prior payment history between NEI and Associates. As this Court stated in *Huennekens v. Marx (In re Springfield Contracting Corp.)*, 154 B.R. 214 (Bankr.E.D.Va. 1993):

> Courts testing "ordinariness" under § 547(c)(2) focus on the prior conduct of the parties, .... the timing of the payments.... The focus of the inquiry must analyze the business practices unique to the particular parties. (citations omitted). This inquiry is "particularly factual." (citations omitted).
>
> Section 547(c)(2).... (B) contemplate[s] a subjective test: Was the ... transfer ordinary as between the debtor and creditor? (citation omitted). To be subjectively ordinary implies some consistency with other business transactions between the parties.

*Id.* at 222.

■ Thus, the analysis under § 547(c)(2) is inherently a subjective one where the parties' relationship during the pre-preference period is scrutinized in order to point out any irregularities that take place during the ninety day preference period. From the undisputed calculations of the Trust, it is obvious that the payments made during the preference period were made later than normal. Here, the suspect transfers were made 24, 22, and 29 days late or an

---

1. 11 U.S.C. § 547(g) states:
   > For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

average of twenty-five days.[2] The Trust points out that the thirty-six payments made before the commencement of the preference period were made on average 6.86 days after the first of the month. Associates, however, points out the nine monthly payments preceding the preference period were made 7, 5, 13, 4, 8, 9, 16, 11, 15, and 28 days after the first of the month or an average of twelve days after the first of the month. Even with Associates' more generous calculation[3], the preference period average of twenty-five days, or twice the number of days late under Associates' analysis, is unusual when compared with the parties's past payment history and thus is not consistent with previous business transactions between the parties.[4] While the last pre-preference payment was accepted some twenty-eight days after the first of the month, one payment does not make a routine and cannot by itself validate those payments made during the preference period of approximately the same lateness. It must also be noted that although the payments were approximately eighteen days later than usual, they were at the same time three times as late as the pre-preference period prior thirty-six months.[5] Some cases which consider it to be a preference where there is a late payment generally have a greater number of days delay, increasing from one or two months normal cycle to three for four months preference cycle or from payment upon delivery to two weeks to a month. *See In re Federated Marketing Inc.,* 123 B.R. 265, 270 (Bankr.S.D.Ohio 1991) and *In re Hancock–Nelson Mercantile Co., Inc.,* 122 B.R. 1006, 1009–15 (Bankr.D.Minn. 1991). When converted to a percentage basis, those time delays are less than what has occurred here. Although a delay of about eighteen days does not seem to be much time, it was a definite alteration in the payment period which was not in the ordinary course of business of the debtor and Associates.

■ However, the Court does not wish to give the appearance that the sole factor in its decision was the days-late percentage increase during the preference period. It will not find the days-late percentage suspect unless, in addition to the days-late percentage increase, the lateness itself is perceptible. For instance, the Court would not consider the timing of payments a factor in its preference analysis where the debtor's payments were three days late in the preference period when payments had been made in a one day normal cycle. In that case, the days-late percentage increase is the same as the instant case, three times the normal lateness. However, the lateness itself, three days, is imperceptible; thus making the timing of the payments in and of itself, non-preferential.

■ Consequently, the transfers fail to meet the test set out in 11 U.S.C. § 547(c)(2)(B). Because of this failure, the transfers cannot be afforded § 547(c)(2) protection since the tests under that section are in the conjunctive and the failure to meet one test necessarily means finding that the transfers are indeed preferential. This being the case, the Court finds it unnecessary to address whether the transfers meet the test under § 547(c)(2)(C)[6]. No other defense to

2. The use of averaging in a court's analysis of 11 U.S.C. § 547(c) is discussed in *First Software Corp. v. Micro Education Corp. (In re First Software Corp.),* 81 B.R. 211, 213–14 (Bankr.D.Mass. 1988), *aff'd* 103 B.R. 359 (D.Mass.1988), and *aff'd* 107 B.R. 417 (D.Mass.1989).

3. Again, Associates calculation only took into account the nine months immediately preceding the commencement of the preference period while the Trust's calculations were based upon the three prior years.

4. Associates admits that NEI's payments within the preference period were made later than most of those outside the 90 day period. *Brief in Support of Defendant's Final Argument,* p. 5 (filed February 8, 1994).

5. In stating that the payments were three times later than normal, the Court is using the trust's pre-preference average calculations.

6. There appears to be a split of authority on whether or not 11 U.S.C. § 547(c)(2)(C) demands an industry standard analysis or is merely another subjective analysis of the parties' relationship. *See* 1 David G. Epstein, Steve H. Nickles, & James J. White, Bankruptcy § 6–31 (1992) and *In re Tolona Pizza Products Corporation,* 3 F.3d

the preference having been asserted by Associates, this court is compelled to conclude that the preferential payments must be avoided.[7]

■ It is generally admitted that preferences are to set aside in order to create equality of distribution in a particular class of creditors. Creation of preference legislation puts the preference creditor who disgorges the preference on par with other creditors and in theory the intent is to put a damper on threatened payments to creditors. That is the principal purpose of preference avoidance. The creditor in the instant case, however, did not rush to collect its claim before the debtor ended up in bankruptcy. In fact, Associates tolerated the debtor's lateness in payment. Nothing it did had the effect of instigating the debtors' "slide into bankruptcy." Although its acts were not violative of one of the purposes of preference avoidance it is nonetheless considered suspect in light of the fact that the creditors' subjective innocence is no defense, for Congress has considered equality of distribution so important that it specifically eliminated consideration of creditors good faith or knowledge in preference actions. *In re Southern Indus. Banking Corp.*, 92 B.R. 297, 301 (Bankr.E.D.Tenn. 1988).

■ The Trust also asks that the Court award it prejudgment interest on the avoided transfers under 11 U.S.C. § 550 reasoning that Associates has had the use of the funds received through the preferential transfers. Addressing the power of bankruptcy courts to award prejudgment interest, the Fourth Circuit has stated: "It is well-settled that bankruptcy courts have discretion to award prejudgment interest in § 547 preferential transfer actions, and to compute interest

from the date of demand for the return of the transferred funds." *In re Cybermech, Inc.*, 13 F.3d 818, 822 (4th Cir.1994). In *Cybermech,* the Fourth Circuit said that the creditor had no more right to keep the accrued interest earned off the preferential transfers than it had to keep the principal. As rationale for its decision, the Fourth Circuit reasoned that if the preferential transfers had not been made, the debtor's estate would have benefitted from the earned interest and that the interest payment serves to compensate the debtor's estate for the creditor's use of the funds withheld. As an additional ground for the decision, the court stated that the payment of interest supports the prime bankruptcy policy of equal distribution among creditors.

Thus, it is determined that Associates should be liable for interest on the preferentially-transferred amounts with said interest to be calculated by the parties from the date of the first demand made by the Debtor-in-Possession or the Trust.

The parties are hereby directed to draft an order conforming to this Memorandum Opinion and submit it to the Court within twenty days.

---

1029, 1032–33 (7th Cir.1993). However, as stated in the text, finding that the transactions failed the § 547(c)(2)(B) test, the Court need not decide whether it will adopt the objective or subjective § 547(c)(2)(C) analysis.

**7.** The Court notes that subsections § 547(c)(1) and (c)(4) do not provide any relief for Associates since allowing the debtor to continue to use the leased equipment does not produce new value.

*See In re Lario,* 36 B.R. 582, 584 (Bankr. S.D.Ohio 1983) (By not terminating the lease, the lessor was "merely exercising a pre-existing right, not giving 'new value'.") and Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy,* 38A Vand.L.Rev. 713, 785–86 (1985).