In the Matter of MILWAUKEE CHEESE WISCONSIN, INC., Debtor.

MILWAUKEE CHEESE WISCONSIN, INC., Debtor in Possession, Plaintiff,

v.

Ronald BUKOWSKI, Jack Straus and Violet Straus, Kathleen A. Durkee, Judith Jaeger, Leander Kieffer, Raymond Erickson, Norman Quamme, Wayne Treder and La Rue Treder, Louis W. Beguhn, Wayne Treder and La Rue Treder, Jean Zwicky, Personal Representative of the Estate of Anne Veronica Kidney, a/k/a Vera Kidney, Defendants.

Bankruptcy No. 85–24450–CNC.
Adv. Nos. 87–2377, 87–2380 to 87–2382, 87–2386, 87–2387, 87–2389, 87–2390, 87–2391 and 87–2396.

United States Bankruptcy Court, E.D. Wisconsin.

Oct. 14, 1993.

Robert L. Mann, Kohner, Mann & Kailas, S.C., Milwaukee, WI.

Roger T. Lambert, Godfrey & Kahn, S.C., Milwaukee, WI.

Dona J. Merg, DeWitt, Porter, Huggett, Schumacher & Morgan, S.C., Madison, WI.

Donald W. Bays, Osstyn, Bays, Ferns & Quinnell, Marquette, MI.

Edward R. Nuss, Gibbs, Roper, Loots & Williams, Milwaukee, WI.

C.N. CLEVERT, Chief Judge.

These consolidated actions are before the court to determine whether transfers to the defendants by Milwaukee Cheese Wisconsin, Inc. (MCWI), the involuntary Chapter 11 debtor and the plaintiff, are avoidable as preferential payments pursuant to 11 U.S.C.

§ 547(b).[1] The plaintiff seeks judgments against the defendants as follows:

| | |
|---|---|
| Ronald Bukowski | $10,091.49 |
| Jack and Violet Straus | $28,156.75 |
| Kathleen A. Durkee | $12,644.54 |
| Judith Jaeger | $12,799.34 |
| Leander Kieffer | $12,734.77 |
| Raymond Erickson | $16,068.62 |
| Norman Quamme | $69,103.91 |
| Wayne Treder and La Rue Treder | $58,522.68 |
| Louis Beguhn, Wayne Treder and LaRue Treder | $70,852.55 |
| Jean Zwicky, Personal Representative of Anne V. Kidney | $37,682.00 |

The defendants argue that they deposited money into a thrift savings plan operated by MCWI and that the funds they received from MCWI were not property of the estate because they were earmarked for them. They assert also that MCWI accepted and retained the deposited funds through an unauthorized, illegal scheme that will unjustly enrich MCWI if they are required to return the funds they received. Hence, they ask this court to find that the funds were impressed with a constructive trust and that they are not recoverable in these preference actions.

Alternatively, the defendants contend that the transfers were not made on account of antecedent debts. They argue that based on Wisconsin law, they were depositors and owners of the funds, they are not creditors of MCWI and that they are entitled to priority over MCWI's general creditors. They maintain that they did not receive more than they would have received under Chapter 7 had the transfers not occurred. Moreover, they allege that the transfers were made in the ordinary course of business and, as such, are excepted from avoidance by MCWI.

## FINDINGS OF FACT

1. The principal business of MCWI was the manufacture, purchase and sale of cheese and related products.

2. At some time during 1972, MCWI established what was commonly known and advertised as a thrift savings plan and solicited funds to be deposited[2] into the plan from its employees, their friends and relatives.

3. Certain employees were issued certificates, based on years of service, evidencing employer contributions to the plan.

4. Under the plan, participants' deposits earned interest at rates announced by MCWI. The interest was computed semi-annually from 1973 through 1979 and quarterly, thereafter, until the accounts were closed in 1985.

5. Alveta Johnson, bookkeeper for MCWI, kept ledger sheets showing each participants' deposits and accrued interest.

6. At regular intervals, MCWI sent each depositor a copy of his/her account ledger showing the account balance, deposits, withdrawals and interest.

7. Balances, including interest, could be withdrawn upon demand with one day's oral or written notice to MCWI.

8. At regular intervals, MCWI sent each depositor tax forms showing the amount of interest posted to the depositor's account.

9. Neither MCWI, nor any of its related entities, was chartered by the State of Wisconsin, in accordance with Chapters 224 and 551 Wis.Stats., to organize and operate a banking, savings and loan or an investment business in Wisconsin.

10. Although some of the depositors received promissory notes, all of their deposits were unsecured.

11. Approximately two months prior to the involuntary petition commencing this case, Stuart Larson, vice-president of MCWI, asked Johnson for a list of thrift savings plan depositors.

12. Jack Straus, an employee of MCWI, and his wife, Violet Straus, deposited $10,000 into the thrift savings plan on June 16, 1977, and received a promissory note. On August 3, 1977, they deposited $21,784.00, evidenced

---

1. These adversary proceedings were tried in two stages. The first stage resulted in a finding that the plaintiff, Milwaukee Cheese Wisconsin, Inc., was insolvent during the 90 day period before its involuntary bankruptcy petition was filed.

2. In the instant case, the terms "deposit" and "depositor" will not be used as terms of art. For convenience, they will be used generically for "placed in" or "turned over to" and for the "person placing in or turning over to."

by a promissory note signed for MCWI by Robert Zwicky, a principal of MCWI.

13. The Strauses requested and received $5,000.00 on October 29, 1984; $10,000.00 on March 8, 1985; and $10,000.00 on April 22, 1985. Mr. Straus orally requested the account balance and received a check for $28,156.75 on October 2, 1985.

14. Leander Kieffer was a retired employee of the Milwaukee Cheese Co. Kieffer received company certificates on January 1, 1973, and January 1, 1975, and deposited $8,000 into the thrift savings plan on March 13, 1984.

15. Kieffer's only withdrawal came after receiving a check for $12,734.77 dated October 17, 1985, that was used to finance his daughter's new home.

16. Kathleen A. Durkee, the daughter of Leander Kieffer, was never employed by MCWI or any related entity. She deposited $10,000 on March 1, 1984, in order to receive the interest rate advertised by MCWI.

17. On September 29, 1985, Durkee submitted a written request to MCWI asking for her account balance to help finance her new home and received a check for $12,644.54, dated October 3, 1985.

18. Judith Jaeger was never employed by MCWI or a related entity. On March 29, 1985, she deposited $11,873.81 and later requested her funds plus interest to buy out a business partner. She received a check for $12,799.34, dated October 1, 1985.

19. Raymond Erickson was never employed by MCWI or a related entity. On April 29, 1985, he deposited $15,000.00 and did not demand any funds until he requested his account balance. He received a check for $16,068.62 on October 15, 1985.

20. Norman Quamme retired from MCWI in 1983. He received a company certificate on January 1, 1973, and January 1, 1975, and made nine additional deposits between April, 1975, and October, 1983.

21. Quamme did not request the money in his account. His name was included on the list of employees requested by Larson.

On October 22, 1985, he was sent a check for $69,103.91 at the direction of Robert Zwicky.

22. Wayne Treder, an employee of MCWI, and his wife, La Rue Treder, received promissory notes for various deposits made between January, 1972, and June, 1980.

23. The Treders demanded and received funds of $20,840.92 on May 19, 1982. At some time in the fall of 1985, they orally requested their account balance and received a check for $58,522.68 on September 6, 1985.

24. Louis Beguhn, the father-in-law of Wayne Treder, received promissory notes for numerous deposits between November 15, 1977, and March, 1982.

25. Beguhn demanded and received $8,047.06 on January 3, 1983. He orally requested his account balance and received a check for $70,852.55, dated September 6, 1985.

26. Ronald Bukowski was never employed by MCWI or any of its entities. He made various deposits from December, 1980, through December, 1984.

27. Bukowski demanded and received $1,605.99 on January 21, 1982; $2,000 on April 2, 1982; $700 on April 2, 1982 and $8,000 on June 9, 1983.

28. At some time in June, 1985, Bukowski orally requested his account balance and received a check for $10,091.49 dated June 25, 1985. He deposited the check on August 21, 1985, and it was honored on August 23, 1985.

29. Anne Kidney, mother-in-law of Robert Zwicky, made several deposits between April 10, 1979, and December 28, 1984.

30. On October 2, 8, and 9, 1985, on instruction from Robert Zwicky, MCWI's bookkeeper caused the company's bank to transfer $37,682.00 from MCWI's advance account to Kidney's personal account within the bank.

31. Jean Zwicky is the personal representative of Anne Kidney's estate.

32. On November 12, 1982, MCWI entered into a Loan and Security Agreement

(Agreement) with Sears Bank and Trust Company.[3]

33. The Loan and Security Agreement was amended several times and Unibanc-Trust Company was substituted for Sears Bank and Trust Company.

34. The borrowing power under the terms of the loan was determined by a formula involving, among other factors, MCWI's inventory and eligible accounts receivable.

35. The agreement included a provision that all collections and proceeds be held separately upon an express trust for Unibanc and that they be turned over to the bank in the form they were received, either by delivery to the bank or remittance to a post office box.

36. MCWI maintained a number of accounts at F & M Stanley, a bank owned by Robert Zwicky. The accounts included (a) a clearing account, (b) an advance account to meet immediate demands for payment, such as withdrawals by thrift savings participants, (c) a special deposit account for money loaned by Unibanc, (d) a disbursement account for paying daily expenses, and (e) a payroll account.

37. Each day the accounts were swept leaving a zero balance and a collateral report was prepared showing available credit.

38. Johnson contacted F & M Stanley Bank to determine what checks had been presented and the account balance.

39. Afterwards, she contacted Unibanc with the beginning balance in the clearing account and the amount needed for the draw that day.

40. Unibanc then put the borrowed funds into the special account of F & M Stanley at Unibanc. Next, Johnson transferred the money from the special account into the disbursement account, payroll account or the advance account.

41. Unibanc knew that the loan proceeds were being used to pay MCWI's creditors.

42. There was no written or oral agreement specifying which creditors were to be paid or how much any particular creditor would receive.

43. MCWI did not establish a separate account for thrift savings deposits.

44. Prior to November 12, 1982, thrift savings deposits were placed into MCWI's general bank account.

45. After November 12, 1982, thrift savings were deposited by MCWI at F & M Bank, Menomonee Falls, transferred to the disbursement account and from there to the clearing account at Unibanc.

46. Prior to and after November 12, 1982, thrift savings deposits were used by MCWI as general operating revenue and thrift savings participants had no control over the funds once they were turned over to MCWI.

47. Depositors' withdrawal checks were handwritten against MCWI's advance account.

48. The thrift savings plan was not part of an employee trust plan or stock plan.

49. On November 22, 1985, an involuntary Chapter 7 petition was filed against MCWI and the case was converted to a case under Chapter 11 on December 6, 1985.

50. Each of the defendants received his/her account balance within 90 days of the filing of the involuntary petition.

51. At the time they requested and/or received their withdrawals, none of the defendants was aware of MCWI's precarious financial condition.

52. There was uncontroverted testimony that on the petition date, MCWI's assets were valued at $2,000,000 and that these were secured claims of at least $2,250,000.

\* \* \* \* \* \*

This court previously ruled that MCWI was insolvent during the entire preference period. To prevail at this stage, the trustee must prove by a preponderance of the evidence that the four remaining elements of a preference are present. *In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986).

3. MCWI's original loan from Sears Bank and Trust Co. was assigned to Unibanc Trust Company on November 15, 1983.

Section 547(b) of the Bankruptcy Code provides that a preferential transfer has occurred if there was (1) a transfer of property of the debtor, (2) to a creditor on account of an antecedent debt, (3) made on or within 90 days before the date of filing the petition if to an outsider, that (4) enables the creditor to receive more than he would have received if the estate were liquidated under Chapter 7. 11 U.S.C. § 547(b).

Bankruptcy Code's preference provisions are intended (1) to discourage creditors from rushing to the courthouse trying to be first in line for any disbursement of the debtor's funds and (2) to provide equality of distribution to all creditors similarly situated. H.R. 95–595 95th Cong., 1st Sess. 177–178 (1977); 5 U.S.Cong. & Adm.News, pp. 5787, 6138–6139.

### TRANSFER OF PROPERTY OF THE DEBTOR

■ A preferential transfer occurs only if the debtor has an interest in the property transferred. Generally, if the transfer will deprive the bankruptcy estate of property that could be used to satisfy the claims of creditors, the property belongs to the debtor for purposes of § 547.

■ In preference actions, federal law determines what constitutes a transfer. *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–70, 65 S.Ct. 405, 407–08, 89 L.Ed. 305 (1945).

A transfer is defined as:

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption[.] 11 U.S.C. § 101(58).

"As a general rule, … a debtor's transfer of borrowed funds is a preferential transfer of the debtor's property under § 547(b), assuming the other elements of that section are met." *In the Matter of Smith*, 966 F.2d 1527, 1533 (7th Cir.1992).

The defendants argue that the funds transferred to them by MCWI were never property of the estate because they were borrowed from Unibanc and earmarked for them. But the argument is not supported by the evidence.

■ The earmarking doctrine is strictly construed, *Michael F. Dubis v. Heritage Bank and Trust Company et al. (In re Kenosha Liquidation Corporation)*, 158 B.R. 774 (Bankr.E.D.Wis.1993), *Glinka v. Bank of Vt. (In re Kelton Motors, Inc.)*, 153 B.R. 417 (Bankr.D.Vt.1993), and the defendants have failed to meet its requirements. *See Wasserman v. Village Assocs. (In re Freestate Management Services, Inc.)*, 153 B.R. 972 (Bankr.D.Md.1993) (The defendants must produce evidence "indicating that the transfer did not involve property of the debtor's estate.") "The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property,'" *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988) and can provide a defense to a preference action. *Coral Petroleum, Inc., v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir.1986) ("The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim.")

■ For the earmarking doctrine to apply in a non-guarantor situation, there must be:

(1) existence of an agreement between the debtor and the new creditor for repayment of an antecedent debt;

(2) the performance of this agreement by which the old creditor receives the agreed consideration;

(3) the debtor's lack of dispositive control over the transferred property;

(4) the transfer's impact on the estate, namely whether the transfer depleted the debtor's estate.

*In re Grabill Corp.*, 135 B.R. 101, 110 (Bankr.N.D.Ill.1991).

■ MCWI had control over the disputed funds after they were borrowed from Unibanc and that the Unibanc loan was not earmarked for payment to the defendants. The loan agreement did not require MCWI to pay specific debts. It directed MCWI to contact Unibanc daily with the amount of

cash needed to cover expenses. Based on that information, Unibanc advanced funds that were deposited into its special account. Funds in the special account were thereafter transferred to MCWI's operating accounts. MCWI then selected and controlled which creditors would be paid and how much each would be paid without input from Unibanc, thereby preferring some creditors over others. *See Smith,* 966 F.2d at 1537.

For the earmarking doctrine to be a viable defense to a preference action, the debtor's estate must not be diminished. *In re Belme,* 76 B.R. 121, 122 (Bankr.S.D.Ohio 1987) (The court must focus on whether the transfer diminished the value of the debtor's estate.). In the instant case, the proceeds of MCWI's secured revolving loan were used to pay unsecured obligations to the defendants. Consequently, this court is satisfied that the funds belonged to MCWI before payment to the defendants and that payments diminished MCWI's estate. *Smith,* 966 F.2d at 1566 ("In the bankruptcy setting, courts have held that transfers by a debtor of borrowed funds constitute transfers of the debtor's property.") *Id.* ("Earmarking doctrine is inappropriate where a secured creditor is substituted for an unsecured creditor.") *See also Van Huffel Tube Corp. v. A & G Industries (In re Van Huffel Tube Corp.),* 74 B.R. 579, 586 (Bankr.N.D.Ohio 1987) ("[T]he earmarking doctrine does not apply to cases where unsecured debt is paid by means of a secured loan.")

## CONSTRUCTIVE TRUST

The defendants are asking this court to find that the funds they received were impressed with a constructive trust because the operation of MCWI's thrift savings plan was fraudulent and illegal. Such a finding requires a determination of property rights.

■ "Property of the debtor" is not defined by the Bankruptcy Code and property interests are determined in accordance with applicable state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In other words, "creditors in bankruptcy receive only what state law allows them." *Belisle v. Plunkett,* 877 F.2d 512, 515 (7th Cir.1989). Hence, this court must examine Wisconsin's view of constructive trusts in determining whether the defendants' thrift savings were impressed with a constructive trust.

In *Prince v. Bryant,* 87 Wis.2d 662, 667, 275 N.W.2d 676 (1979), the Wisconsin Supreme Court observed that courts of equity may impose a constructive trust "to prevent unjust enrichment arising when one party receives a benefit the retention of which would be unjust as against the other." It added that unjust enrichment must be accompanied by some other factor, such as actual or constructive fraud, duress, abuse of confidential relationship, mistake, commission of a wrong or any form of unconscionable conduct and that the proponent of the constructive trust must be able to trace a res, identifiable in its original or substituted form. *See also In the Matter of Adametz,* 53 B.R. 299, 305 (Bankr.W.D.Wis.1985).

■ In this case, the defendants have the burden of establishing grounds for a constructive trust by clear and convincing evidence. *Shapiro v. Rubens,* 166 F.2d 659 (7th Cir.1948) (A person seeking to enforce a constructive trust has the burden of establishing facts which give rise to such a trust by clear and convincing evidence.) *See also Nehls v. Meyer,* 7 Wis.2d 37, 43, 95 N.W.2d 780 (1959) ("[T]he party seeking to establish the constructive trust has the burden of proving the oral arrangements by clear and convincing evidence.") Here, the defendants have failed to sustain their burden of proof. MCWI concedes that it did not have authority to operate a bank, investment house or savings and loan.[4] See § 224.03 Wis.Stat. It acknowledges also that it did not file with

---

4. 224.02. Banking, defined. The soliciting, receiving, or accepting of money or its equivalent on deposit as a regular business by any person, copartnership, association, or corporation, shall be deemed to be doing a banking business, whether such deposit is ... evidenced by ... a note, ... or other writing....

Wis.Stat. § 224.03. Banking, unlawful, without charter; penalty. It shall be unlawful for any person, copartnership, association, or corporation to do a banking business without having been regularly organized and chartered as a national bank, a state bank or a trust company bank.

the Wisconsin commissioner of securities any information required to exempt securities from registration under § 551.22(10) Wis. Stat. (Plaintiff's Reply Brief at 7–8). Notwithstanding these concessions, there is no evidence that MCWI acquired funds from the defendants by fraudulent means or that MCWI was unjustly enriched. MCWI paid most of these defendants upon demand as it agreed and others were paid without making a request. Moreover, there is no evidence of a trust res or any attempt to trace thrift savings beyond deposit into MCWI's bank account.

The evidence is that invested funds were commingled, transferred among MCWI's general accounts and then used to pay ordinary operating expenses. As a consequence, the defendants are precluded from receiving the benefit of a constructive trust. *See Adametz*, 53 B.R. at 306. (Constructive trust could not be imposed because the proceeds from the sale of the asset were commingled and could not be sufficiently identified.) Furthermore, imposition of a constructive trust could undermine the fundamental bankruptcy policy of equitably distributing a debtor's assets to creditors by effectively granting these defendants an unrecognized priority. *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924). See also 3 Collier on Bankruptcy, ¶ 507.02[1] (15th ed. 1993).

### TO A CREDITOR ON ACCOUNT OF AN ANTECEDENT DEBT

■ The defendants argue that MCWI's obligations to them were not antecedent debts because the sums they received were not due and owing until demand was made. Their reasoning is flawed.

Debt is defined as a liability on a claim, 11 U.S.C. § 101(12), and claim, in turn, means:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is re-

duced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured....

11 U.S.C. § 101(5). "The terms 'claim' and 'debt' are coextensive. A creditor has a 'claim' against the debtor, the debtor owes a 'debt' to the creditor." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 310 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6267; S.Rep. No. 95–989, 95th Cong., 2d Sess. 23 (1978 U.S.Code Cong. & Admin.News, p. 5809. *In re Independent Clearing House Co.*, 41 B.R. 985, 1011 (Bankr.D.Utah 1984).

Although the Bankruptcy Code does not state when a debt is incurred, under the above definitions, it is clear that the defendants became creditors when they turned over funds to MCWI. At that moment, they were entitled to demand the return of their deposits. This right constituted a claim under the Bankruptcy Code. *See Stamp v. Insurance Co. of North America*, 908 F.2d 1375, 1382 (7th Cir.1990). ("That the obligation is not liquidated until demand does not make the obligation less a debt.") *See also Barash*, 658 F.2d at 509, (The debt became due " 'when ... the debtor obtain[ed] a property interest in the consideration exchanged giving rise to the debt.' " (citations omitted)); *Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 480 (Bankr.D.Nevada 1985). (An obligation to repay a loan or investment is incurred when the debtor receives the funds.) If the defendants had not received the payments, they would be creditors of the debtor. It follows, that what we have here is "the type of payment that Congress intended § 547 to reach." *In re Energy Cooperative, Inc.*, 832 F.2d 997, 1002 (7th Cir.1987).

### MADE ON OR WITHIN 90 DAYS BEFORE THE DEBTOR FILED HIS BANKRUPTCY PETITION

Except for Ronald Bukowski, the defendants do not dispute that the transfers occurred within the 90 days before MCWI was named in an involuntary petition. Bukowski asserts that MCWI intended his transfer to occur on the date its check was issued, that he was paid on that date and, that his pay-

ment was outside the 90 day preference period.

 Federal law determines "[w]hat constitutes a transfer and when it is complete." *Barnhill v. Johnson*, — U.S. —, —, 112 S.Ct. 1386, 1387, 118 L.Ed.2d 39 (1992), citing *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–370, 65 S.Ct. 405, 407–408, 89 L.Ed. 305 (1945). Accordingly, the Supreme Court held in *Barnhill* that "[f]or the purposes of payment by ordinary check, ... a 'transfer' as defined by [11 U.S.C.] § 101(54) [now § 101(58) ] occurs on the date of honor, and not before." [5] It follows that the transfer to Bukowski occurred on August 23, 1985, the date MCWI's check was honored by the bank and that the transfer occurred within the 90 day preference period. *Barnhill,* — U.S. at —, 112 S.Ct. at 1390.

### RECEIVED MORE THAN IF LIQUIDATED UNDER CHAPTER 7

A payment is not a preference unless the creditor receives more than would have otherwise been received in a Chapter 7 liquidation if the transfer had not been made. 11 U.S.C. § 547(b)(5). To establish this, MCWI was required to construct a hypothetical Chapter 7 liquidation of the debtor's estate on the petition date and to show that creditors would receive less than 100% distribution. *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987).

The defendants acknowledge being unsecured and receiving all of the funds they deposited plus accrued interest. In addition, they have not refuted testimony that MCWI's assets were insufficient to pay unsecured claims in a Chapter 7 liquidation bankruptcy. *See Ray v. City Bank and Trust Co. (In re C–L Cartage Co. Inc.)*, 899 F.2d 1490, 1492 (6th Cir.1990):

In view of the above, the plaintiff has met its burden and established avoidable preferences in accordance with 11 U.S.C. § 547(b). There were (1) transfers of MCWI's property for the benefit of the defendants; (2) the

transfers satisfied antecedent debt owed by MCWI to the defendants; (3) the transfers were made while MCWI was insolvent and within 90 days before the date of the filing of the involuntary petition; (4) and, the transfers enabled the defendants to receive more than they would have received in a Chapter 7 liquidation of MCWI's assets. The plaintiff has established also that secured debt of $328,656.75 was substituted for an equal amount of unsecured debt.

### ORDINARY COURSE OF BUSINESS

Although a preferential payment has been proven, the defendants still may avoid liability by establishing that their payments fall within one or more of the exceptions enumerated in 11 U.S.C. § 547(c). Of these, the only defense they have raised is the "ordinary course of business" exception of § 547(c)(2).

 This exception must be narrowly construed. *Committee of Unsecured Creditors for Pittsburgh Cut Flower Co., Inc., v. Hoopes (In re Pittsburgh Cut Flower Co., Inc.)*, 124 B.R. 451, 460 (Bankr.W.D.Pa.1991). Moreover, it is intended to protect normal financial transactions. *In re Energy Cooperative, Inc.*, 832 F.2d 997, 1004 (7th Cir.1987), *In re Richardson*, 94 B.R. 56, 59 (Bankr. E.D.Pa.1988). Section 547(c)(2) provides that:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

 "In determining whether a payment is made in the ordinary course of business, a court should consider the 'prior course of dealing between the parties, the

---

**5.** U.C.C. § 1–201(21) defines honor as when the drawee bank pays the check. *Barnhill,* — U.S.

at —, 112 S.Ct. at 1390.

amount of the payment, the timing of the payment and the circumstances surrounding the payment.'" *In the Matter of Writing Sales Ltd. Partnership*, 96 B.R. 179 (Bankr. E.D.Wis.1988) (citations omitted). The factors for examination include: (1) whether the transfer was in an amount more than usually paid, *In re Southern Industrial Banking Corp.*, 72 B.R. 512 (Bankr.E.D.Tenn.1987), (2) whether the payments were tendered in a manner different from previous payments, *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir. 1986), (3) whether there appears to be any unusual action by either the debtor or creditor to collect or pay on the debt, *In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986), and (4) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition, *In re Magic Circle Energy, Corp.*, 64 B.R. 269 (Bankr.W.D.Okla.1986).

■■■ A successful § 547(c)(2)(A) defense is presented by proving that the debt at issue is of "the kind routinely carried between the creditor and the debtor." *Duvoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 92 B.R. 297, 302 (Bankr. E.D.Tenn.1988). The preference defense is written conjunctively, and the defendants must satisfy all three elements by a preponderance of the evidence. *In re Financial Partners, Ltd.*, 116 B.R. 629, 637 (Bankr. N.D.Ill.1989); *Duvoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 92 B.R. at 302.

■■■ Courts have developed tests for determining whether transfers are within the ordinary course of business. In *In re Richardson*, 94 B.R. at 59, the court found that a subjective test should apply to a course of dealings considered pursuant to a defense under 11 U.S.C. § 547(c)(2)(B) and that an objective test should apply to defenses under § 547(c)(2)(C). That combined subjective/objective analysis will be applied here.[6] Hence, this court will next look at the dealings between the defendants and MCWI to determine whether the transfers at issue are con-

sistent with other business transactions between them. *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr.W.D.Okla.1986); *Southern Industrial Banking*, 92 B.R. at 302. Afterward, it will consider the objective or industry wide test of § 547(c)(2)(C) to determine whether the subject transfers were made according to common industry practice. *Richardson*, 94 B.R. at 60.

■■■ The parties stipulated that the debtor's principal business included the manufacture, purchase and sale of cheese and related products. The operation of a thrift savings plan might be considered an irregular method of raising capital for such an enterprise as MCWI. However, the defendants produced evidence showing that MCWI had a history of obtaining working capital by this method and the defendants were long time participants in the plan.

MCWI began soliciting for its thrift savings plan in 1973. Regular criteria was established for making deposits and withdrawals and the defendants deposited their thrift savings according to the terms of the plan. Additionally, Ronald Bukowski, Jack and Violet Straus, Kathleen Durkee, Judith Jaeger, Leander Kieffer, Raymond Erickson, Wayne and La Rue Treder and Louis Beguhn demanded payment as specified by the plan and were unaware of MCWI's slide toward bankruptcy. On the other hand, Quamme and Kidney were paid without making a demand—transactions which were not in accord with the plan and inconsistent with their prior dealings. Consequently, the defendants—except for Quamme and Kidney—have satisfied their burden under § 547(c)(2)(B) and have shown that the transfers at issue were received in the ordinary course of their dealings with MCWI.

Nevertheless, all of the defendants failed to prove that the deposits and payments were made according to common industry practice. Sections 224.02 and 224.03, Wis. Stats., make it illegal for a corporation, not chartered as a bank and unauthorized to do a banking business, to engage in illegal bank-

---

6. Citing Michael Bloom, Richard Gorelick, and Heather MacKenzie, *Exceptions to Bankruptcy Preferences: Countryman Updated*, 47 The Business Lawyer 529 (1992), the Seventh Circuit stated that "most courts adopt the combined subjective/objective analysis to evaluate transfers under section 547(c)(2)." *In re Excello Press Inc.*, 967 F.2d 1109, 1114, n. 3 (7th Cir.1992).

ing. *See also State ex rel. Rohn Shoe Mfg. Co. v. Industrial Com.*, 217 Wis. 138, 258 N.W. 449 (1935). The record is devoid of evidence that it is common industry practice for a corporation to initiate a thrift savings plan contrary to Wisconsin law. In the absence of such evidence this court has no basis for concluding that the withdrawals/transfers at issue were consistent with any industry practice. *See In re Southern Indus. Banking Corp.*, 72 B.R. 512, 515 (Bankr.E.D.Tenn. 1987) (An act that violates a statute and authorized regulations can under no circumstances be construed as an "ordinary course of business transaction" or "according ordinary business terms.")

## CONCLUSION

For the reasons stated, which constitute this court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, the plaintiff has met its burden of proving that the subject transfers are voidable preferences pursuant to 11 U.S.C. § 547(b) and the defendants have failed to establish to prove that the transfers are excepted from recovery under 11 U.S.C. § 547(c)(2). Accordingly, judgment will be entered against the defendants in the amounts sought.