In the Matter of **MILWAUKEE CHEESE WISCONSIN, INC.,** Debtor.

**MILWAUKEE CHEESE WISCONSIN, INC.,** Plaintiff,

v.

Jack **STRAUS** and Violet **Straus,** Wayne **Treder** and La Rue **Treder,** Louis Be-**guhn,** Wayne **Treder,** and La Rue **Treder,** Defendants.

**Bankruptcy No. 85–24450–CNC.**
**Adv. Nos. 87–2380, 87–2390 and 87–2391.**

United States Bankruptcy Court, E.D. Wisconsin.

April 13, 1995.

398

Robert L. Mann of Kohner, Mann & Kailas, S.C., Milwaukee, WI, for debtor-plaintiff.

Dona J. Merg of Merg & Anderson, S.C., Madison, WI, for defendants Jack and Violet Straus.

Donald W. Bays of Osstyn, Bays, Ferns & Quinnel, Marquette, MI, for defendants Wayne and La Rue Treder.

## AMENDED MEMORANDUM DECISION

C.N. CLEVERT, Chief Judge.

### INTRODUCTION

The United States District Court remanded this preference action for reconsideration of whether payments by the debtor totaling $157,531.98, within 90 days of bankruptcy, were made according to ordinary business terms. The district court ruled that this requires a determination of the industry in which Milwaukee Cheese Wisconsin was engaged, as provided by 11 U.S.C. § 547(c)(2)(C). *Milwaukee Cheese Wisconsin, Inc., v. Treder (In re Milwaukee Cheese Wisconsin, Inc.)*, No. 93–1361, August 10, 1994, slip op. at 5. It also directed this court to decide "whether the various factors rele-

vant to the timing, method, and amount of the transfer (e.g., the manner in which the [defendants] ... requested and received payment), were in accordance with the usual practice in the relevant industry." *Id.* at 8–9.

In their briefs on remand and in argument before the court, the defendants contend that the banking industry is the relevant industry and that the avoidability of the payments they received must be assessed in light of that industry's standards. The defendants also acknowledge that the record is devoid of evidence concerning banking industry standards or practices. (Tr. of Proceedings, 1/17/95 at 9, 14). For that reason, they asked the court to take judicial notice of banking operations or, alternatively, to allow them to present additional testimony regarding practices in the banking industry. (Tr. of Proceedings, 1/17/95 at 9–10).

The plaintiff contends that the defendants have known from the outset of this case that they have the burden of proving the nonavoidability of the transfers in question. *See* 11 U.S.C. § 547(g). Hence, the plaintiff concludes that the defendants should not be allowed to introduce additional evidence to support their contentions after the fact. In effect, the plaintiff argues for the application of the "one bite at the apple" principle.

During a hearing on January 17, 1995, this court allowed the defendants to offer proof outlining the evidence they would present if the court reopened the testimony. (Tr. of Proceedings, 1/17/95 at 17–26). After a series of questions and answers, the defendants advised the court that

there is no way to establish ... throughout the entire financial [industry] ... a conformity and uniformity of the way that demand and payment are made.... But whether it's paid within 10 minutes or 24 hours or by check or cash out of a draw [sic] or however it's done [it] is the individual relationship that is the ordinary course of business between the debtor and creditor. And you will never be able to establish uniformity in that regard because it doesn't exist. It is the very thing that it's

left to individuality. It shouldn't be a criteria.

(Tr. of Proceedings, 1/17/95 at 21–22). After considering the arguments and briefs, the court declined to take judicial notice of how the banking industry handles demand accounts. Instead, the court found that the defendants failed to sustain their burden of proving the nonavoidability of the transfers at issue. The defendants did not show that the transfers were in accordance with ordinary business terms, nor did they present evidence that the banking industry was the relevant industry for the purpose of establishing the benchmark for assessing whether the timing, method and amount of the transfers at issue were in accordance with industry practice. The court went on to hold that the cheese industry was the relevant industry, a finding consistent with its earlier memorandum decision and the joint final pretrial stipulation of the parties.

While the court stands by its oral decision, a further review of the record and relevant case law has shed additional light on this matter. Specifically, a closer reading of *Matter of Tolona Pizza Prods. Corp.*, 3 F.3d 1029 (7th Cir.1993), reveals that the Seventh Circuit stated the relevant industry against which "ordinary business terms" are gauged under § 547(c)(2)(C), must be determined vis-a-vis the creditor; the district court stated that the relevant industry is determined according to the industry of the debtor. Here, however, that difference is of no consequence. As the following discussion and summary of this court's earlier memorandum decision indicate, the defendants have failed to prove that the transfers at issue fall within the ordinary course of business exception.

## FACTS

As stated in this court's earlier decision,[1] Milwaukee Cheese Wisconsin, Inc. ("MCWI," "plaintiff" or "debtor") was principally engaged in the production, purchase and sale of cheese and other related products. Sometime in or about 1972, MCWI established a "thrift savings plan" which was funded through contributions by employees, their relatives and friends. This plan was neither sanctioned nor chartered by the State of Wisconsin, and was not in compliance with applicable federal and state regulations. Under the terms of the plan, contributors would receive interest on their investments[2] at interest rates announced periodically by MCWI, and could withdraw all or a part of the "account" balance upon one day's oral or written notice. There was no set time period for which the funds would be invested and, therefore, there was no penalty for early withdrawal.

Defendants Jack and Violet Straus engaged in several transactions with the plan. They were as follows:

| Date | Transaction | Amount (in Dollars) |
| --- | --- | --- |
| 6/16/77 | Deposit | 10,000.00 |
| 8/3/77 | Deposit | 21,784.00 |
| 10/29/84 | Withdrawal | 5,000.00 |
| 3/8/85 | Withdrawal | 10,000.00 |
| 4/22/85 | Withdrawal | 10,000.00 |
| 10/2/85 | Withdrawal | 28,156.75[3] |

The Strauses received promissory notes from MCWI for both of the deposits.

Defendants Wayne and La Rue Treder made several deposits into the plan between January, 1972, and June, 1980, and received promissory notes for each. The Treders withdrew $20,840.92 on May 19, 1982, and the "account" balance of $58,522.68 was withdrawn on September 6, 1985.

Defendant Louis Beguhn, Wayne Treder's father-in-law, was and remained retired after opening his "joint account" in November, 1977, and made numerous deposits until March, 1982. On January 3, 1983, Beguhn withdrew $8,047.06 and on September 6, 1985, the plaintiff paid him the "account" balance of $70,852.55 following an oral demand.

On November 22, 1985, an involuntary Chapter 7 petition was filed against MCWI

---

**1.** *In re Milwaukee Cheese Wisconsin, Inc. (Milwaukee Cheese Wisconsin, Inc. v. Bukowski, et al.)*, 164 B.R. 297 (Bankr.E.D.Wis.1993). All findings of fact from the previous decision are adopted and incorporated herein by reference. Only the facts pertinent to the instant discussion will be set forth.

**2.** The words "investment," "deposit," and "withdrawal" are used to indicate the giving of money to and/or the receipt of money from MCWI. They are not used as terms of art and merely reflect the terminology used by the parties.

**3.** This withdrawal depleted the account.

and the case was converted to one under Chapter 11 on December 6, 1985. Thereafter, MCWI, as debtor-in-possession, instituted these adversary proceedings to avoid and recover the $28,156.75 transfer to the Strauses, the $58,522.68 transfer to the Treders and the $70,852.55 transfer to Beguhn (collectively "defendants" or "creditors") as preferences under 11 U.S.C. § 547 and 550. The defendants asserted the affirmative defense that the transfers in question, although preferences, were not subject to MCWI's avoiding powers because the payments were made in the ordinary course of business.

## DISCUSSION

■■■ By now, it is well settled that subsections (A), (B) and (C) of § 547(c)(2) are distinct and each must be proven separately. A subjective analysis is applied to subsection (B) and an objective analysis is applied to subsection (C). *See, e.g., Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir. 1994); *Jones v. United Savings and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680 (8th Cir.1993); *Tolona Pizza, supra; Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239 (6th Cir.1992). That is to say, when proving a transfer was made according to "ordinary business terms," a creditor does not have to prove the existence of and conformity with a uniform set of industry-wide

practices, but rather that the practice engaged in by the creditor is also engaged in by firms "similar in some general way to the creditor." *Tolona Pizza*, 3 F.3d at 1033. However, a determination under § 547(c)(2) is a factual one, *Jones*, 9 F.3d at 683; *In re M & L Business Machine Co.*, 164 B.R. 657 (D.Colo.1994), which may turn on any number of considerations. *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 224 (3d Cir.1994). *See also Advo–System*, 37 F.3d at 1050; *Tolona Pizza*, 3 F.3d at 1033.

The court, therefore, turns to the questions of "relevant industry" and "ordinary business terms" using a three part analysis.

The first step is to focus on the transactions between the plaintiff and the defendants to determine into which industry they fall. Here, at the most basic level, the defendants gave money to the plaintiff with a promise that it would be returned with interest upon demand. Effectively it was a loan, similar in some general way to transactions engaged in by entities in the banking industry.

■■■ However, this does not end the inquiry, as a literal *Tolona Pizza* might suggest. Rather, *Tolona Pizza* implies that there must be some showing by the defendants/creditors that they were actually part of or engaged in the industry into which the transaction falls.[4] A creditor's allegation

---

4. *See Tolona Pizza*, 3 F.3d at 1032–1033:

   If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in *the industry*, this casts some doubt on his (self serving) testimony.

   \* \* \* \* \* \*

   [T]he creditor must show that the payment he received was made in accordance with the ordinary business terms *in the industry*. But this does not mean that the creditor must establish the existence of some single, uniform set of business terms, as Tolona argues. Not only is it difficult to identify the industry whose norm shall govern (is it, here, the sale of sausages to makers of pizza? The sale of sausages to anyone? the sale of anything to makers of pizza?), but there can be great variance in *billing practices within an industry*. Apparently there is in this industry, whatever exactly "this industry" is[.]

   \* \* \* \* \* \*

   Rose and its competitors pay little or no attention to the terms stated on their invoices, allow most customers to take up to 30 days to pay,

   and allow certain favored customers to take even more time. There is no single set of terms on which *the members of the industry* have coalesced; instead, there is a broad range....

   (emphasis added) (citation omitted). *See also, Kepler v. Aetna Finance Co. (In re Ausman Jewelers)*, 177 B.R. 282, 285 (Bankr.W.D.Wis.1995) (stating that there was a failure to produce "any evidence that the transaction was ordinary for *the industry as a whole. See Matter of Tolona Pizza Products Corp.*, 3 F.3d at 1033....") (emphasis added); *Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat, Inc.)*, 176 B.R. 540, 550 (Bankr. N.D.Cal.1995).

that it acted in a manner consistent with a particular industry without proving that it was, in fact, part of that industry, will not suffice. For if it did, any preferred creditor would stand to reap the benefit of the ordinary course of business defense by demonstrating that it acted in a manner consistent with *some* industry's practice, regardless of the practices within the creditor's own industry or, for that matter, the industry within which both the debtor and the creditor are operating. The result of a rationale that permits a creditor to pick and choose the industry of which it is a part, would be to allow the exception to engulf the rule; an unquestionably absurd result at odds with the purpose of the statute. *See generally,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 372–375 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6328–31; *Tolona Pizza,* 3 F.3d at 1032.

■ Third, the creditor must prove that the terms of the underlying transaction between the debtor and the creditor were within the range of terms normally imposed upon similarly situated creditors and debtors. *See Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, L.P.),* 178 B.R. 426 (Bankr. W.D.Tex.1995). The third part of the analysis must be considered when determining "ordinary business terms," as the range of terms encompassing the practices of firms similar to the creditor must inherently encompass firms similar to the creditor that engage in transactions with firms similar to the debtor. This is because the creditor may have different standards or practices depending upon with whom and in what capacity it is dealing.

Take the example of a paper manufacturer who wears three different hats: selling its products to wholesalers, acting as a wholesaler and selling to retailers, and selling directly to the public through a retail business of its own. That paper manufacturer may very well have different credit terms with wholesalers and retailers than with the public at its retail store. Clearly, then, when dealing with a particular debtor, the entire gamut of the paper manufacturer's credit terms need not be considered, nor are they all relevant. Rather, assuming the paper manufacturer is selling to a wholesaler, the range of terms to be considered are only the range of terms extended to other wholesalers. Similarly, if the debtor is an individual or small corporation buying from the creditor at its retail store, there is no need to consider the range of credit terms extended to wholesalers or the range of terms imposed when the company acts as a wholesaler. One need only examine the range of credit terms imposed upon other entities purchasing retail directly from the manufacturer.

In this case, the record is devoid of evidence indicating that either the debtor or the defendants were part of the banking industry. To the contrary, the debtor's business was the manufacture, purchase and sale of cheese and related products. Defendants Jack Straus and Wayne Treder were employees of the debtor at the time they "invested" their funds with the debtor. Hence, their industries must be the cheese industry as well. Louis Beguhn was retired at the time his "joint account" with his daughter and son-in-law was opened, and he remained retired thereafter. His industry is, therefore, either cheese, by virtue of the joint obligation, or no industry, by virtue of his retirement.

There has been no attempt to show that these defendants are part of the banking industry. Rather, there have merely been allegations that the defendants acted in a manner consistent with actors in the banking industry which, as outlined above, is inadequate and contrary to the teachings of *Tolona Pizza.* Thus, the additional evidence proposed by the defendants, in the form of oral testimony concerning the nature and practices of the banking industry, would have been irrelevant and insufficient to sustain their affirmative defense.

For these reasons, the court finds that the defendants have failed to carry their burden of proving that the transfers at issue were made according to "ordinary business terms" pursuant to 11 U.S.C. § 547(c)(2)(C). Consequently, the transfers in question will be set aside as preferences, and judgment will be entered accordingly.