In re SACRED HEART HOSPITAL OF NORRISTOWN d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.

SACRED HEART HOSPITAL OF NORRISTOWN, Plaintiff,

v.

E.B. O'REILLY SERVICING CORP., Defendant.

Bankruptcy No. 94–13275DAS.
Adversary No. 96–0518DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 5, 1996.

Matthew Strickler and Vincent J. Marriott, Philadelphia, PA, for Debtor.

John A. Kane, Thomas Blazusiak, Senior Assistant Counsel, Robert Slavkin, Assistant Counsel, Sallie A. Rodgers, Assistant Counsel, Leslie S. Oakes, Assistant Counsel, Commonwealth of Pennsylvania, Department of Public Welfare, Harrisburg, PA, for Defendant.

Neal D. Colton, Cozen & O'Connor, Philadelphia, for Creditors' Committee.

Robert Lapowsky, Wayne, PA, for AllMed Financial Corp.

John J. Koresko, V, Koresko & Noonan, Norristown, PA, for certain former employees of Debtor.

Claudia Z. Springer, Duane, Morris & Heckscher, Philadelphia, PA, for Municipal Bonds Investors Insurance Co.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The parties have properly confined the remaining issue in this proceeding to whether, in establishing a defense to an action to recover a preferential transfer under 11 U.S.C. § 547(c)(2), the defendant-creditor need prove that the payments were made "according to ordinary business terms" within the creditor's entire industry, or merely the creditor's dealings with parties in the debtor's particular industry. Although the issue is not addressed directly in any of the authorities cited by the parties or known to us, it appears that the proper emphasis must be upon the creditor's industry as a whole. Finding that the creditor's evidence relating to payment terms in its entire industry is lacking in requisite specificity in the instant record, a preference judgment will be entered against the creditor.

### B. PROCEDURAL AND FACTUAL HISTORY

The instant proceeding ("the Proceeding") arises in what we hope are the waning days of the complex bankruptcy case of SACRED HEART HOSPITAL OF NORRISTOWN d/b/a SACRED HEART HOSPITAL AND REHABILITATION CENTER ("the Debtor"). The citations and descriptions of all of the prior reported decisions arising out of this case are collected in our last decision slated for Bankruptcy Reporter publication, an adversary proceeding against the Commonwealth's Department of Public Welfare presently reported only at 1996 WL 446827, at *1 (Bankr.E.D.Pa. August 7, 1996), and will not be reiterated here. The Proceeding was filed on May 3, 1996, as one of the first of about 150 post-confirmation preference actions initiated by the Debtor. It is believed that, of the apparently 140 "pure" preference cases among these actions, this is the last to be resolved. Just one other of these 140

actions, against Santangelo Hauling, Inc., required any written decision on our part, which is to be reported only at 1996 WL 432296 (Bankr.E.D.Pa. July 30, 1996) ("Sacred Heart I").

The complaint filed in the Proceeding alleged that E.B. O'REILLY SERVICING CORP. ("the Defendant"), a heating, ventilation, and air conditioning contractor at the Debtor's hospital, received two checks dated February 25, 1994, in the amounts of $4,230.00 and $4,603.90, respectively, during the preference period. At the trial conducted on August 14, 1996, after two continuances, the parties agreed that the Defendant had supplied unpaid invoices properly classifiable as "new value," pursuant to 11 U.S.C. § 547(c)(4), totalling in value $5,046.00. Therefore, the parties agreed that $5,046.00 was deductible from the Debtor's claim, leaving only $3,787.00 in issue. The Defendant conceded that payments in this amount were preferential. The only defense to the remaining claim was under 11 U.S.C. § 547(c)(2), i.e., that the payment in this amount could not be avoided because it was made "in the ordinary course of business."

The only witness at the trial was Charles L. Powers, a long-time key employee of the Defendant who was also Director of a trade organization, the American Subcontractors Association ("the ASA"). Powers testified that the parties' contractual relationship did not begin until January 1992. He indicated that the $4,603.90 check represented payments for a quarterly service charge of $4,230.00, invoiced on August 2, 1993, plus certain repair work invoiced on September 16, 1993. The $4,230.00 payment was for the quarterly service charge invoiced on November 1, 1993.

The terms set forth on each of the Defendant's billings read as follows:

TERMS: NET ON BILLING. A FINANCING SERVICES CHARGE OF 1% PER MONTH OR A MINIMUM OF 50 CENTS PER MONTH ON THE OVERDUE BALANCE 30 DAYS BEYOND TERMS.[1]

---

1. Powers characterized these terms as "net 30 days," which was not totally accurate. The

terms are net due *on billing*, with finance charges due after 30 days. The Defendant did

Powers also presented records of all of the Debtor's eleven (11) payments made to the Defendant, other than the preferential payments in issue, since the Defendant began invoicing the Debtor for payments. The earliest invoice was dated June 30, 1992. The lapse between the respective invoices and payments ranged from four months to nine months.

Powers testified that the Defendant did business with about twelve (12) other hospitals. Although no statistics or records were produced, he testified that they all generally delayed in paying billings until "90 to 150 days" after the dates of invoices. Powers further stated that, on the basis of his discussions with other ASA members, totalling about 200 in a radius of about 75 miles from the Philadelphia metropolitan area, which area includes, by his estimate, about 60 hospitals, he believed that other contractors generally were compelled to similarly wait between 90 and 150 days for payments from hospitals. However, in response to questioning from the court, Powers readily admitted that the Defendant's other customers paid much more promptly.

The substance of the Defendant's defense was, then, that the $3,787.00 payment in issue not offset by new value, made 116 days after the invoice for payment, was within the range of "ordinary business terms" between contractors and hospital creditors in its "industry."

## C. DISCUSSION

The instant proceeding presents a narrow issue of interpretation of subsection (C) of 11 U.S.C. § 547(c)(2), which reads in its entirety as follows:

(c) The trustee may not avoid under this section a transfer—

.    .    .    .    .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; . . .

■ It is established in this Circuit that § 547(c)(2)(C) presents an "objective" test regarding billing practices generally within the relevant industry, separate and distinct from the "subjective" test relating solely to dealings between the parties set forth in § 547(c)(2)(B). *See In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 223–28 (3d Cir. 1994). This analysis is consistent with that of all of the other circuits which have addressed this issue except the Eleventh Circuit. *See In re Craig Oil Co.,* 785 F.2d 1563, 1566–67 (11th Cir.1986). *See generally In re Roblin Industries, Inc.,* 78 F.3d 30, 39 (2d Cir.1996). It is also consistent with the position articulated by this court in, *e.g., In re St. Mary Hospital,* 1990 WL 103733 (Bankr. E.D.Pa. July 16, 1990); *In re Atlantic Fish Market, Inc.,* 100 B.R. 755, 756 (Bankr. E.D.Pa.1989); and *In re American Int'l Airways, Inc.,* 83 B.R. 324, 332–33 (Bankr. E.D.Pa.1988), *aff'd,* C.A. No. 88–3529 (E.D.Pa. August 15, 1988), *rev'd on other grounds sub nom. Begier v. United States,* 878 F.2d 762 (3d Cir.1989), *aff'd sub nom. Begier v. Internal Revenue Service,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

Certain standards which we must apply the interpretation of the "objective" test set forth in § 547(c)(2)(C) are articulated at length in *Molded Acoustical Products, supra,* 18 F.3d at 224–26, as follows:

The preference provisions are designed not to disturb normal debtor-creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should the contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors....[2] Therefore, when the relation-

---

not, however, include any demand for finance charges in its billings to the Debtor.

**2.** From a public policy standpoint, it might be argued that protecting a creditor which allows a debtor unusually liberal payment dispensations, which could save a debtor from bankruptcy, should be protected. However, this particular public policy is not recognized in § 547(c)(2).

ship in question has been cemented long before the onset of insolvency—up through and including the preference period—we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business.... On the other hand, where the relationship is of recent origin, a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation, and to countenance such behavior could be unfair (or could appear unfair) to the remaining creditors who exhibit the virtue of patience.

With all that said, we adopt the following rule of construction as an aid to resolving these problems: the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).

.   .   .   .   .

... When the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry....

... Even when the debtor/creditor relationship has been well-settled prior to the debtor's insolvency, should the creditor be unable to fit its terms within the sliding-scale window surrounding the established industry's norm, the preferential transfer will not be deemed unavoidable by virtue of § 547(c)(2), although the terms of §§ 457(c)(2)(A) & (B) are fulfilled. That is to say, the parties' longstanding credit terms, although consistent as between them, may depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors....

■ Applying the language of *Molded Acoustical Products,* we conclude that the

parties' relationship, involving invoices billed only in the 16–month period from June 30, 1992, to November 1, 1993, was "of recent origin," as opposed to being "cemented long before the onset of insolvency." *See id.* at 225. Therefore, "a rigorous comparison to credit terms generally in a relevant industry" is necessary. *Id.* Also, a payment 116 days after a bill's invoice appears to depart "grossly" from the written contract terms, when the articulated terms are "net on billing" with finance charges commencing 30 days after billing. *Id.* at 226.

■ There is no question that the burden of proving each element of § 547(c)(2), and therefore that § 547(c)(2)(C) has been satisfied, lies with the Defendant. *See, e.g.,* 11 U.S.C. § 547(g); and *Molded Acoustical Products, supra,* 18 F.3d at 221 & n. 5. The question is whether the Defendant has met this burden by presenting the testimony of Powers, unsupported by any specific data, that the Defendant's payment, 116 days after invoicing, fell within the range of ordinary business terms in dealings with hospital customers in the Defendant's industry, although admittedly not within the range of typical terms with the Defendant's customers in general. We cannot find that the Defendant has met its burden with this showing.

The parties' briefs and our own research appears to support the conclusion that neither *Molded Acoustical Products* nor any other authority has directly addressed the issue of whether such evidence of "ordinary business terms" in the Debtor's industry suffices to satisfy § 547(c)(2)(C). Although the issue is raised in the decision on which *Molded Acoustical Products* most expressly relies, *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993), it is not resolved in that decision, despite a reference there, quoted by the Debtor, to "practices in which firms similar in some general way to the creditor" engage, as opposed to practices engaged in by firms similar to the debtor. *Id.*

The analysis of the court in *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1050 (4th Cir.1994), assumed that the creditor's industry was the relevant industry. *Advo–System* also holds that the generalized sort

of evidence which the Defendant provided here, even when applied only to the creditor's industry, is insufficient to satisfy § 547(c)(2)(C). *Id.* at 1051. Therefore, the Debtor is correct in its argument that, under the analysis of *Advo–System*, it is unlikely that the Defendant could succeed on the basis of its proffered evidence.

The reasoning of *Advo–System* is adopted by a post-*Tolona Pizza* decision from the Seventh Circuit in *In re Midway Airlines, Inc.*, 69 F.3d 792, 796 (7th Cir.1995). The *Midway Airlines* court likewise concludes that the creditor's entire industry must be analyzed in the course of a successful § 547(c)(2)(C) showing, and that a lack of specific evidence regarding competitors' terms was fatal to a § 547(c)(2) defense.

The Defendant cites several cases in support of its thesis that the focus of its evidence upon the Debtor's industry is sufficient, *Roblin Industries, supra,* 78 F.3d at 42; *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d 680, 685 (8th Cir.1993); and *In re Milwaukee Cheese Wisconsin, Inc.*, 191 B.R. 397, 401 (Bankr.E.D.Wis.1995).

Initially, we note that the § 547(c)(2) defenses raised in *Roblin Industries* and *Milwaukee Cheese* were unsuccessful. And neither decision states specifically that an analysis of the debtor's industry is permissible as an alternative to an analysis of the industry of the creditor.

Moreover, the language from *Roblin Industries* seized upon by the Defendant (" 'ordinary business terms' must include those terms employed by similarly situated debtors and creditors facing the same or similar problems") does not reflect that court's decision to utilize the debtor's industry as a touchstone. *Id.* Other passages in that same paragraph and later in that opinion, *id.* at 43, indicate that the *Roblin Industries* court's focus is on the creditor's industry.

In *U.S.A. Inns* the debtor's payments were designated as "irregular," including no reference to the precise lengths of the delays in payments. 9 F.3d at 681–82 & n. 1. Without making any reference to the debtor's industry, the *U.S.A. Inns* court accepted the creditor's testimony that its dealings with the debtor were common in the defendant's savings and loan industry as a whole. *Id.* at 685.

We note two other decisions, *In re Carled, Inc.*, 91 F.3d 811 (6th Cir.1996), the most recent Court of Appeals decision discussing § 547(c)(2)(C); and *St. Mary Hospital, supra,* our own prior decision which appears to present facts closest to the instant facts. In *Carled,* the court reversed a decision rejecting a § 547(c)(2) defense, holding that a showing that a significant percentage of the defendant utility's customers paid within 30 to 41 days after the billing cycle, in which time period the debtor's allegedly-preferential payments were apparently made, was sufficient to satisfy § 547(c)(2)(C). The *Carled* facts are distinguishable from those of the instant case because the evidence of the billing practices of the defendant and another area utility were presented, and they included a very specific statistical analysis of the timing of all customers' payments to these utilities. Also, the allegedly preferential payments were only slightly late. Here, the only evidence presented by the Defendant in support of its § 547(c)(2) defense were Powers' rather vague approximations of payment terms by other hospitals to his and other ASA members. And, the payment in issue grossly departed from the express terms of the parties' contract, in that it was 116 days late.

In *St. Mary* we rejected a defendant electrical supplier's attempt to confine its § 547(c)(2)(C) analysis to its hospital customers. The evidence reflected that the debtor's payments in issue were between 77 to 122 days after the respective invoiced dates, and that at least one of the defendant's other two hospital customers paid more promptly than the defendant. 1990 WL 103733, at *1, *2. This evidence does not suggest that hospitals in this area generally pay as long as 116 days after billing.

None of the foregoing cases suggests that a preference defendant can succeed by confining his objective evidence of "ordinary business terms" to only the debtor's industry. The cases that mention any distinction between emphasis on the debtor's industry as opposed to the creditor's industry appear

to uniformly assume without expressly deciding the issue that the focus must be on the creditor's entire industry.

Not only was the pertinent evidence presented by the instant Defendant confined to the Debtor's industry, but also it provided no indication of what percentage of the Defendant's business is conducted with hospitals. Moreover, the evidence presented by the Defendant was totally lacking in specificity, consisting of merely broad estimates of a wide range of delay time in payments (90 to 150 days). Actual statistical evidence could conceivably establish that very few customers, even hospital customers, delay as long as 116 days in making payments. *Compare St. Mary, supra.*

Moreover, 116 days is, by any standard, and in any circumstance, a long time beyond the contract terms to delay in making a payment. It is well beyond the 45–day benchmark which prevailed under the pre–1984 version of § 547(c)(2). *See* former 11 U.S.C. § 547(c)(2)(B) (repealed). *Cf. In re Lila, Inc.,* 1993 WL 62382, at *2 (Bankr. E.D.Pa. March 5, 1993) (we utilized the former 45–day period as a benchmark in finding that the defendant there had a valid § 547(c)(2) defense).

We therefore conclude that the Defendant has not met its burden of proving the element referenced in § 547(c)(2)(C), and that therefore its only defense as to the $3,787.00 remaining preferential payment balance must fail.

█ Finally, we note that, while past decisions of this court have established that the Debtor is generally entitled to pre-judgment interest from at least the date of the filing of a proceeding challenging preferential payments, these rulings have been made in the absence of circumstances justifying denial of such interest. *See, e.g., Sacred Heart I,* at *1; *In re Samar Fashions, Inc.,* 109 B.R. 136, 139 (Bankr.E.D.Pa.1990); and *In re Art Shirt Ltd., Inc.,* 68 B.R. 316, 325 (Bankr. E.D.Pa.1986), *aff'd,* 93 B.R. 333 (E.D.Pa. 1988). Here, the facts that the Defendant had an admittedly valid § 547(c)(4) defense to more than half of the amount originally claimed and a respectable § 547(c)(2) defense as to the balance cause us to excise any claims for pre-judgment interest, noting that imposition of costs and post-judgment interest at the rate established in 28 U.S.C. § 1961 follows any judgment as a matter of course.

*D. CONCLUSION*

An Order consistent with the foregoing Opinion will be entered.